CITY OF CHICAGO et al. v. NEW YORK, C. & ST. L. R. CO.

(Circuit Court of Appeals, Seventh Circuit. April 14, 1914. Rehearing Denied May 22, 1914.)

No. 2036.

1. RAILROADS (§§ 75, 93*)—RIGHT OF WAY—LOCATION—STREET CROSSINGS.

Under Illinois law a railroad company may locate its right of way in a city, including a way on or across streets without consulting the city, subject to the limitation that construction on or across a street may not be undertaken without the assent of the city; but, when the city in fact assents, the property right becomes as completely vested as if the grant had been direct from the sovereign.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191, 260–265; Dec. Dig. §§ 75, 93.*]

2. CONSTITUTIONAL LAW (§ 297*)—EMINENT DOMAIN (§ 2*)—VESTED RIGHTS—CITY ORDINANCES—RAILROADS.

Where defendant city passed an ordinance in 1909 providing for the separation of the grades of a street from that of certain railroads cross-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing the same, providing for an elevated structure on which the tracks of another company should be superimposed on the structure by which complainant's tracks were to be carried over the street, and in order to comply with such ordinance complainant, at large expense, was required to obtain a new right of way to fit the required point or crossing, complainant thereby acquired a vested property right to cross the street pursuant to the scheme of such ordinance, which right the city could not impair, without compensation or without due process of law, by the subsequent passage of another ordinance requiring complainant to cross the street at another place and the right of way of such other company either north or south of the street crossing, so that the structure over the street should be two separate single elevated structures instead of two at the same point one superimposed upon the other.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 297;* Eminent Domain, Cent. Dig. §§ 3–12; Dec. Dig. § 2.*]

**3.** RAILROADS (§ 98*)—RIGHT OF WAY—LONG OR CROSS STREETS—SHIFTING OR ELEVATION—POLICE POWER.

Though a railroad company may insist on holding its perfected right of way latitudinally and longitudinally, a city, in the interest of the public and in the exercise of police power, if authorized by the state so to do, may enforce a shifting or elevation of the tracks within the limits of the right of way on or across the streets.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 291, 292, 296; Dec. Dig. § 98.*]

**4.** RAILROADS (§ 98*)—CROSSING STREET GRADE—SEPARATION OF GRADES—ORDINANCES—AMENDMENT.

Where defendant city passed an ordinance in 1909 for the separation of the grades of a street and certain railroad crossings, contemplating a structure by which one railroad was carried over the street above another, and complainant railroad company acquired a right of way to comply with such plan, a subsequent ordinance requiring the erection of separate single structures over the street which would lessen and shorten the street grades and obviate the necessity of pumping surface water of the subway into the city's sewers was not an attempt to appropriate complainant's property within the constitutional prohibition of taking property, but was an attempt to exercise the police power as to the improvement of the street, but unenforceable in the absence of a lawful amendment of the plans under the former ordinance.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 291, 292, 296; Dec. Dig. § 98.*]

**5.** RAILROADS (§ 98*)—STREET CROSSINGS—SEPARATION OF GRADES—TIME.

Where an ordinance providing for the separation of grades of a street and certain railroads crossing the same provided for a structure on which the tracks of one railroad were superimposed on another and required that the elevation work be completed by December 31, 1911, the ordinance not having provided for a forfeiture or abrogation of the elevation plans in case of delay, the railroad company's failure to complete the work within the time specified did not bar its rights in its right of way that became vested under the ordinance.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 291, 292, 296; Dec. Dig. § 98.*]

**6.** MUNICIPAL CORPORATIONS (§ 724*)—POLICE POWER—DAMAGES—CITY'S LIABILITY.

Where a city in the exercise of its police power attempted in good faith to pass an ordinance changing the form of the structure by which a railroad company should cross a street above the grade of a street, which ordinance was invalid, such invalidity did not render the city liable for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

damages to the railroad company resulting from increased cost of operation by reason of delay, caused by the ordinance.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1545, 1561, 1568; Dec. Dig. § 724.*]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Kenesaw M. Landis, Judge.

Suit by the New York, Chicago & St. Louis Railroad Company against the City of Chicago and Lawrence E. McGann, Commissioner of Public Works. Decree for complainant, and defendants appeal. Modified and affirmed.

Charles M. Haft, of Chicago, Ill., for appellants.
John H. Clark and Robert J. Cary, of Chicago, Ill., for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge. This appeal involves principally the nature and effect of an ordinance of 1909 and an amendatory ordinance of 1912.

Prior to 1909 appellee and the Lake Shore, the Pennsylvania, the Baltimore & Ohio, and the Illinois Central Companies operated railroads that crossed each other and public highways at grade in the neighborhood of Seventy-Ninth street in Chicago. The street ran east and west; the railroads, in a general north and south direction. By the 1909 ordinance a comprehensive scheme was adopted to separate the grade of the street from that of the railroads and the grades of the railroads from each other. At the point where appellee was to cross Seventy-Ninth street, the plan required the street to be depressed 17 feet, next above the street the elevated structure of appellee, and above that the elevated structure of the Illinois Central. To carry out this plan it was necessary for appellee to abandon its old right of way, and to procure a new right of way north and south of the street, the assent of the city to cross the street at the new location, and a new easement to cross the Illinois Central right of way. In the ordinance the city assented to appellee's crossing the street at the new location. At great expense appellee secured a new right of way to fit the required point of crossing Seventy-Ninth street. Elevation work was to be completed by December 31, 1911. On that date work was progressing without objection from the city, but nothing had then been done in erecting the superstructure over Seventy-Ninth street, and the Commissioner of Public Works had not issued or been requested to issue a permit for that part of the work.

In February, 1912, the city council passed an ordinance, amendatory of that of 1909, by which appellee was required to cross Seventy-Ninth street at a new location, and to cross the Illinois Central right of way either north or south of Seventy-Ninth street, so that at Seventy-Ninth street there should be two separate, single, elevated structures, instead of two at the same point, one superimposed upon the other.

After the adoption of the 1912 ordinance, appellee demanded of the Commissioner that he issue a permit for work at Seventy-Ninth street in accordance with the 1909 ordinance, unamended. This he refused on the ground that the demand was not in accordance with the ordinance as amended.

Thereupon appellee began this suit; and, after joinder of issues and production of proofs, the court decreed that appellee had a vested property interest in the right of way across Seventy-Ninth street as located by appellee under the 1909 ordinance; that the requirement of the 1912 ordinance that appellee should relocate its right of way was illegal and void; that the commissioner should issue a permit for elevation work according to the plans of the 1909 ordinance; and that appellee recover damages from the city in the sum of $31,290.42.

[1, 2] Two distinct elements, in our opinion, appear in the 1909 ordinance. One is a grant of a property right. Under Illinois law a railroad company has authority to locate its right of way, including a way upon or across streets, without consulting the city. That authority flows from the sovereign. The only limitation is that construction of the railroad upon or across a street shall not be undertaken without the assent of the city. When the city assents, the property right becomes as completely vested as if the grant had been directly from the sovereign. C. & W. I. R. Co. v. Dunbar, 100 Ill. 110; Tudor v. Rapid Transit R. Co., 154 Ill. 129, 39 N. E. 136. And of course a vested property right cannot be taken away without just compensation or due process of law. Grand Trunk W. R. Co. v. South Bend, 227 U. S. 544, 33 Sup. Ct. 303, 57 L. Ed. 633, 44 L. R. A. (N. S.) 405. So when Chicago by its assent expressed in the 1909 ordinance completed appellee's title to a right of way across Seventy-Ninth street at the designated place, in latitude and longitude, power was lacking thereafter to destroy or impair the property right by an ordinance of the character of that of 1912.

[3] The other element in the 1909 ordinance is the exercise of police power. Though a railroad company may insist upon holding its perfected right of way latitudinally and longitudinally, a city in the interest of the public, if authorized by the state so to act, may enforce a shifting or an elevation of the tracks within the limits of the right of way upon or across a street. C. B. & Q. R. Co. v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; C. I. & W. R. Co. v. Connersville, 218 U. S. 336, 31 Sup. Ct. 93, 54 L. Ed. 1060, 20 Ann. Cas. 1206; Grand Trunk W. R. Co. v. South Bend, 227 U. S. 544, 33 Sup. Ct. 303, 57 L. Ed. 633, 44 L. R. A. (N. S.) 405. Undoubtedly the principal object of the 1909 ordinance was to command and control track elevation in the interest of public travel on Seventy-Ninth street. That legislation was under a power which would not be foreclosed by a contract to that effect, even if the city had not expressly reserved the power in the 1909 ordinance. But nevertheless the part of the ordinance that constitutes a grant of property rights must be upheld as fully as if the grant were in an ordinance by itself.

[4] No change in the 1909 plans and specifications of elevated structures over Seventy-Ninth street was made in terms by the 1912 ordinance. But the effect of that ordinance, if it had been accepted by ap-

pellee, or if the change of location of the right of way therein required could be enforced, would be to cancel the plans and specifications of the two-storied elevated structure, and, according to the evidence of the engineers, the erection of separate, single structures at the locations indicated would do away with a large part of the depression of Seventy-Ninth street, lessen and shorten the grades, and obviate the necessity of pumping the surface water of the subway into the city's sewers. As the scope of an ordinance may properly be judged by its effect in operation (Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220), we deem the 1912 ordinance to be an attempt to exercise the police power with respect to the grade and drainage of Seventy-Ninth street and the elevation of railroad tracks thereover. It interfered with the use and enjoyment of the 1909 grant of the right to cross by offering as a substitute another grant and commanding that the latter alone be used, in order to improve Seventy-Ninth street; but it did not profess to be an appropriation of appellee's property within the meaning of the constitutional prohibition of the taking of property. It did not even prohibit or interfere with the use of the 1909 grant generally, but only in the way specified in the 1909 plans. But inasmuch as there was no lawful amendment of the 1909 plans, the part of the decree that commands the Commissioner to issue appellee a permit to erect a structure over Seventy-Ninth street in accordance with the 1909 ordinance was proper.

An objection to the decree is based on the alleged insufficiency of the evidence to establish appellee's acceptance of the 1909 grant. But in view of the admission in appellants' answers, "That it is true that the various railroad companies, in said ordinance of 1909 named, accepted said ordinance, as by the terms thereof was provided," it was needless for appellee to bring forward (and we will not examine) any evidence on that subject.

Appellee introduced its corporate charter and evidence to show that by foreclosures, reorganizations, consolidations, and leases, it acquired in the village of Hyde Park (now a part of the city where Seventy-Ninth street and the railroad crossings in question are located) all the rights granted to the original company that constructed the railroad now operated by appellee; and the parties have had an extended debate over the legal effect of that evidence. We refrain from setting out or discussing the details, for we conceive it sufficient to say that in 1909 appellee had legal capacity to accept the city's grant, and the city is not concerned collaterally with appellee's rights under other instruments.

[5] A contention is advanced that no rights can be held under the 1909 ordinance, because the elevation work was not finished by December 31, 1911. As heretofore pointed out, two separate matters are contained in the 1909 ordinance. The time limitation is attached to the elevation provisions. It is not a definition of the duration of the grant of a right of way. Even as to elevation, time was not made essential; no forfeiture or abrogation of the elevation plans was to be a consequence of delay in finishing the work. Moreover, the city treated the 1909 ordinance as being in force by passing the 1912 amendatory ordinance.

Appellants' assertion that the Illinois Central was an indispensable party is obviously without merit. Appellee counted solely on its own property rights.

[6] Respecting damages, however,· difficulties appear. During the elevation work appellee by a contract had arranged to bring its trains into the city over the Rock Island tracks at a charge of $4,470 a month. If the Commissioner had issued the permit when demanded, appellee could have completed its elevated structure over Seventy-Ninth street by November 1, 1912, and the detouring charge would have been borne as a part of the elevation expenses. But the Commissioner's refusal caused a delay beyond November 1, 1912, which was continuing at the time of the trial; and the court awarded damages at the rate of $4,470 a month from November 1, 1912, to the entry of the decree. Apart from a doubt whether the contract price for the use of Rock Island tracks (during which time appellee was being saved capital, operating, and maintenance charges on part of its own right of way) was the correct measure of damages for interference with the use of appellee's right of way across Seventy-Ninth street, and another doubt whether appellee alone should be permitted to recover the detouring charge when before suit appellee and the other roads had entered into a contract to do all the elevation work jointly and to pay all expenses, including this detouring charge, from a common fund, we believe there is a radical objection. It is elementary that a state is exempt from damages consequent upon invalid legislation in an attempted exercise of the police power; the difficulty is in the application of the principle and its corollary respecting the delegated powers of municipalities. If a state should enact a passenger fare of a cent a mile and require double crews of trainmen; and if a railroad company, under duress of threats of prosecution and police interference, should comply with the statute, but at once bring suit to enjoin its further enforcement; and if a court should refuse to hold the statute invalid on expert testimony as to its probably confiscatory effect and should thereupon dismiss the bill without prejudice (Knoxville v. Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Louisville v. Cumberland Tel. Co., 225 U. S. 430, 32 Sup. Ct. 741, 56 L. Ed. 1151); and if in a renewed suit the statute, on evidence of actual experience thereunder, should ultimately be held invalid —it seems to us clear that neither the state, nor the Legislature, nor the court, would be liable for the railroad company's damages through diminished revenue or increased expense while the validity of the statute was being tested. And so if a city, in an invalid, but a good faith, attempt to exercise its delegated legislative power over trades, should damage a tradesman by reason of the ordinance's making his business more expensive to conduct while he was having the ordinance adjudged invalid, the city would find shelter from damages under the state's immunity. If the 1912 ordinance is not attributable to Chicago's governmental power received from and on behalf of Illinois, appellee may be entitled to its actual damages. But, for reasons stated in a prior paragraph, we think the ordinance was an invalid attempt to exercise in good faith the police power, and nothing but that. If an ordinance is a valid exercise of the power, those upon whom it operates have no cause

of suit for injunction. It is only when injunction would lie on account of an ordinance's invalidity that a city needs to share in the state's exemption from damages.

The decree is modified by striking therefrom the award of damages, and as so modified is:

Affirmed.