(No. 18488.—

THE CHICAGO NORTH SHORE AND MILWAUKEE RAILROAD COMPANY, Appellant, *vs.* THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed June 23, 1928—Rehearing denied October 23, 1928.*

Ralph R. Bradley, Patrick J. Lucey, and Addison L. Gardner, (Gilbert E. Porter, of counsel,) for appellant.

Samuel A. Ettelson, Corporation Counsel, Bernard P. Barasa, Simon Herr, and John G. Drennan, for appellees.

Mr. Justice Stone delivered the opinion of the court:

Appellant filed a bill in the superior court of Cook county seeking to enjoin the city of Chicago and various of its officers from interfering with appellant's use of the elevated railroad tracks of the Chicago Rapid Transit Company for merchandise dispatch and passenger traffic. The city filed a cross-bill seeking to enjoin appellant from operating its merchandise dispatch trains and passenger trains over the tracks of the transit company. The decree of the

superior court granted the prayer of the original bill so far as it related to the traffic of appellant over the elevated tracks from the north boundary of the city of Chicago at Howard street south to Irving Park boulevard, on what is known in the record as the Evanston Division of the Chicago, Milwaukee and St. Paul railroad. The decree denied the injunction sought in the original bill as it relates to the tracks of the elevated railroad extending from Irving Park boulevard south through and around what is known as the Loop Division and thence south to Sixty-third street and Dorchester avenue, and granted the injunction prayed in the city's cross-bill as to those tracks. Appellant brings the cause here for review, the trial court certifying that the validity of an ordinance is involved and that the public interest requires that the appeal be taken to this court. The city has not appealed from that portion of the decree granting the prayer of the original bill as to the elevated tracks from Irving Park boulevard north to the city limits.

The question involved in the case is whether appellant has a right to operate its passenger and merchandise dispatch trains over the elevated railroad from Irving Park boulevard south. Appellant contends that this right was given to it or its predecessors by the Public Utilities Commission, later the Commerce Commission, by certain orders entered May 28, 1919, and November 2, 1921, in which the commission found that public convenience and necessity required the approval of certain operating agreements between appellant's predecessor and the predecessors of the Chicago Rapid Transit Company, by which agreements the former was permitted to run its electric trains carrying passengers and merchandise dispatch service or package freight over the elevated railroads. The city contends that these orders of the commission are void and of no effect, and that the elevated railroad companies had no right or authority to enter into such an operating agreement with appellant without consent of the city and of certain property

owners owning the fee in the streets in a portion of what is known as the Loop Elevated Railway Division and the South Side Elevated; that by the terms of the ordinances by which the city permitted the construction of the elevated railroads, traffic thereon was to be confined to passenger traffic; that this was true also of certain frontage consents given by owners of abutting property in the district referred to. The city also claims that such operating agreements create an additional burden on the streets. As we understand the contention of the city, it is not that the elevated railroad companies which are now merged in the Chicago Rapid Transit Company do not have the right to use the streets, but that appellant has no such right and cannot obtain that right by an agreement with the elevated railroad companies without the consent of the city.

It will be necessary, in order to understand the situation of the parties, to state as briefly as possible the somewhat complicated history of the origin of these utilities.

Appellant, the Chicago North Shore and Milwaukee Railroad Company, herein referred to as the North Shore Company, is the successor to the Chicago North Shore and Milwaukee Railroad, herein designated appellant's predecessor. Appellant owns and operates an interstate commercial electric railroad organized under the Railroad act. It extends from Linden avenue, in the village of Wilmette, Illinois, to the city of Milwaukee, Wisconsin, and has also certain branch lines not here involved. At Linden avenue, in Wilmette, it connects with the tracks of the Evanston Division of the Chicago, Milwaukee and St. Paul Railway Company, known herein as the St. Paul Company. This latter company is an interstate steam railroad corporation organized under the laws of Wisconsin. One of its lines known as the Evanston Division extends from Irving Park boulevard, in the northern part of the city of Chicago, north to Linden avenue, in the village of Wilmette. In 1907 it was by ordinance of the city of Chicago required to elec-

trify that part of its road in the city. By this ordinance it was permitted to operate its Evanston Division line in connection with the Northwestern Elevated Company, one of the elevated railroads later merged into the Chicago Rapid Transit Company, and an incline was constructed between the two roads. During that year the St. Paul Company and the Northwestern Elevated entered into an agreement for the joint operation of that portion of its tracks known as the Evanston Division. Certain other agreements were made between these railroads which are not material here, since the city is not contesting the right of appellant to operate in the city of Chicago from the northern limits south to Irving Park boulevard.

In July, 1910, the city of Chicago passed an ordinance requiring the St. Paul Company to elevate the tracks of the Evanston Division lying in the city of Chicago. On May 7, 1919, the St. Paul Company, with appellant's predecessor and the Northwestern Elevated Company, filed with the Public Utilities Commission a petition seeking the approval of a lease dated March 31, 1919, from the St. Paul Company to appellant's predecessor, of that portion of the former's tracks extending north from Irving Park boulevard and to assent to an operating agreement between appellant's predecessor and the Northwestern Elevated Company for a joint operation by those companies of the Evanston Division of the St. Paul Company. Certain other agreements not material to this case were also involved. The commission on May 28, 1919, entered the order hereinafter mentioned. It found that the city of Chicago had been notified of the hearing and appeared by its attorneys and offered no objection but stated that on investigation of the lease it could find nothing objectionable to the interests of the public or the city in the terms and provisions thereof and consented to and approved the execution of the lease and operating agreements. The order of the Public Utilities Commission approved this lease and these agreements, and

as they have been likewise approved by the decree of the superior court in this case, and the city is not here objecting to the decree or to the jurisdiction of the Public Utilities Commission to enter the order, no further consideration need be given to that branch of the case.

The Northwestern Elevated Railroad Company, the South Side Elevated Railroad Company, the Lake Street Elevated Railroad Company, the Oak Park Elevated Railroad Company, the Metropolitan West Side Elevated Railway Company, the Union Elevated Railroad Company and the Union Consolidated Elevated Railroad Company were all railroad organizations organized under the Railroad Incorporation act of this State. Each constructed a part of the elevated railroad system extending south from Irving Park boulevard to and around the Loop and on south to and on Sixty-third street and other extensions, both south and west, which are not necessary to the consideration of this case. In 1924 parts of them were consolidated into the Chicago Rapid Transit Company, also a railroad organized under the Railroad Incorporation act, and other portions were purchased by that road, so that for the purposes of this case the elevated railroad structure over which appellant seeks to continue its passenger and merchandise dispatch freight traffic is merged into the Chicago Rapid Transit Company.

In 1921 appellant filed a petition with the Commerce Commission seeking its consent and approval of an intercorporate operating agreement with the various elevated railroads, providing for an extension of through passenger and merchandise dispatch service by appellant over the elevated railroad structures south from Irving Park boulevard to and around the Loop and south to Sixty-third street, by which agreement the passenger service was to be extended to Sixty-third street and Dorchester avenue and the merchandise dispatch service to Sixty-third street and Calumet avenue. After a hearing before the commission, at which

hearing the city of Chicago was represented by counsel, the Commerce Commission entered an order finding that there is a public demand for the immediate operation by appellant of cars for the carriage of merchandise dispatch service over the elevated railroad structures through the Loop to Sixty-third street and Calumet avenue, and that there is a demand for an extension of through passenger service by appellant over the elevated line on the South Side to Sixty-third street and Dorchester avenue. It found that the cars of appellant can be operated by it over the tracks of the elevated railroad companies for the performance of the services in question without requiring any material change in the tracks and structures of the companies, and that public interest and convenience require that such service be immediately undertaken and carried on; that such service would not interfere with the performance of the duties of the elevated railroads nor result in injury to them or detriment to the service, and the inter-corporate operating agreement which was dated November 8, 1921, was approved and the service ordered. The commission also found that no objection or opposition to the service was offered by the city of Chicago nor by any of the parties interested. The commission ordered that a certificate of convenience and necessity be granted to appellant to so operate its cars as to give both passengers and freight the service known as merchandise dispatch service. Thereafter that service was put into operation and continued from then on until shortly before the filing of the bill herein, when certain officials of the city of Chicago threatened to prosecute any further operation by appellant over the elevated railroad structures. As the temporary injunction issued in this cause has been by the chancellor continued, this service is still in operation.

The service that is being carried on by appellant is as follows: Passenger and merchandise dispatch service on the tracks of the Evanston Division of the St. Paul Company, as approved by the order of the commission in 1919,

also passenger service on the main line of what is now the Chicago Rapid Transit Company south from Irving Park boulevard to the northwest corner of what is known as the Loop Division, thence over the west and south sides of the Loop Division, thence south to Sixty-third street, and thence east to Dorchester avenue. It is also conducting passenger service north from Dorchester avenue and Sixty-third street to the southeast corner of the Loop Division, thence north and west along the east and north sides of the Loop Division, thence north to Irving Park boulevard, and on through Evanston and Wilmette to Milwaukee, Wisconsin. The merchandise dispatch service follows this same route, except that it goes south only to Sixty-third street and Calumet avenue. Appellant does not perform any local passenger service or local merchandise dispatch service in the city of Chicago. It stops its passenger cars and trains at certain stations within the city of Chicago to receive and discharge passengers going to and coming from points on its railroad north of Linden avenue, in the village of Wilmette. Its merchandise dispatch service is from certain designated stations in the city of Chicago to points on its lines north of Linden avenue. It has three merchandise dispatch stations: one located at Montrose avenue on the Evanston Division of the St. Paul Company, on the North Side; one known as the North Water street terminal; and one at Sixty-third street and Calumet avenue, on the South Side.

The bill alleges and the proof shows that as a result of the approval and order of the Public Utilities Commission in 1919 and 1921 appellant has expended large sums of money, in excess of three million dollars, for equipment and improvement of its service, and relying on the order of the commission appellant is constructing a branch line north of the north boundary of the city of Chicago, passing near Niles Center and joining the main line of appellant north of Wilmette; that the total expenditure will amount

to more than five million dollars. It shows that it has developed a passenger business carrying into and out of the city in 1924, 2,863,021 passengers, and during the first six months of 1925, 1,354,833 passengers; that the service has been a great convenience to the traveling public and to the people of the State and the city of Chicago, as well as the intervening municipalities between Chicago and Milwaukee; that until the complaint made by the city on October 8, 1924, out of which this case has grown, no one entered any complaint against the service.

It is unnecessary to set out fully all of the allegations of the pleadings and the facts proved or admitted. There is little or no controversy as to the facts. Those stated here are sufficient to show the situation of the parties.

The city by its answer set out the various ordinances by which the predecessors of the Chicago Rapid Transit Company were permitted to construct the elevated railroad structures in and across the streets. These ordinances were passed at different times from October 1, 1894, down to 1907, and later. The ordinances provided that the elevated railroad structures should be used for passenger service, only. Certain frontage consent agreements secured by the various elevated railroad companies constructing the South Side Elevated railroad and the elevated railroad in the Loop Division also limited the use of the elevated railroad structures to passenger service. The city argues that because of these ordinances appellant gained no right by its intercorporate operating agreements with the various elevated railroad companies, or by the orders of the Public Utilities Commission and the Commerce Commission, which the city is bound to recognize, but that appellant is attempting to conduct a freight and passenger service over these elevated railroad structures without the consent of the city and certain abutting property owners, and therefore without authority of law, and that the attempts on the part of said commissions to grant such right and order such service are

null and void. Appellant contends that the ordinance limiting the service of the elevated railroad companies to passenger service, only, has been rendered void by the action of the Public Utilities Commission and the Commerce Commission.

The question of first importance arising in the case is as to the effect of the passage of the Public Utilities act of 1913 and amendments thereto. Appellant contends that the superior court erred in holding, as a matter of law, that in the absence of an ordinance of the city authorizing appellant to use the elevated railway structures now used by it, it has no right or authority to operate its trains for the transportation of passengers and freight over any of such elevated railway structures south of Irving Park boulevard by order of or with the consent of the Public Utilities Commission, now the Commerce Commission. The city argues that its ordinances, with written acceptances thereof, together with the frontage consent agreements, constitute valid and binding contracts between the city and the elevated railroad company and prohibit making or entering into the inter-corporate agreements in question without the consent of the city and abutting property owners. It has frequently been recognized by this court that by the charters of the various elevated railroads, now the Chicago Rapid Transit Company, each was given authority to locate its right of way upon or across the streets of the city of Chicago, subject to the assent of the city and the property owners. Such assent was given, and these elevated railroads became vested of a property right as completely as though the grant had been directly from the State. *Tudor v. Rapid Transit Railroad Co.* 154 Ill. 129; *Chicago and Western Indiana Railroad Co. v. Dunbar,* 100 id. 110; *City of Chicago v. New York Central and St. Louis Railroad Co.* 216 Fed. 735.

Paragraph 43 of chapter 114 (Smith's Stat. 1927, p. 2185,) provides that "all railroad companies incorporated

or organized under * * * the laws of this State, shall have power to make such contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof." This paragraph of the statute has been construed to confer upon railroads the right to make contracts for the use of their tracks with any other railroad companies, and the city has no power to prohibit such use. (*Terre Haute and Peoria Railroad Co.* v. *Robbins,* 247 Ill. 376; *Chicago and Western Indiana Railroad Co.* v. *Dunbar, supra; Illinois Midland Railway Co.* v. *People,* 84 Ill. 426.) The city, however, contends that the lessee or usee railroad by such an agreement acquires no greater powers and privileges than are conferred upon the lessor or user railroad and is subject to all restrictions placed upon such lessor or user railroad, and cites in support of this contention, *City of Aurora* v. *Elgin Traction Co.* 227 Ill. 485. In that case an agreement was entered into between the Aurora Street Railway Company and the Joliet, Plainfield and Aurora Railroad Company, referred to in the opinion as the Joliet Company, an interurban railroad, whereby the former agreed to haul the cars of the interurban company over the streets of the city of Aurora. It was held that sections 44 and 45 of the Railroad act, providing that railroad companies shall have power to make contracts with each other for leasing their roads or any part thereof, did not apply to a contract between a street railway company and an interurban railroad company organized under the Railroad act; that the interurban railroad had no right to enter the streets of the city of Aurora without first obtaining a license from the city. It was held that the city had power to regulate the use of the streets and to impose limitations and conditions under which the license to occupy the streets may be granted. That case, and similar cases cited by the city, were decided before the enactment of the Public Utilities act. In this case all the railroads were organized under the Railroad act.

In *Northern Trust Co.* v. *Chicago Railways Co.* 318 Ill. 402, it was held that the Public Utilities act of 1913 is complete in itself and covers the whole subject of public utility regulation; that by that statute the General Assembly had recalled from cities and villages the power which had been exercised by them, and it was intended by the General Assembly to abrogate the power theretofore exercised by the cities to prescribe limitations and conditions upon which the use of the streets, when that use has once been granted by the city, shall be exercised by the railroad companies. That the Public Utilities act was a revision of the whole subject of utility regulation cannot be doubted. Power to regulate and limit the manner in which railroad companies may use the streets when once consent is given, rests at all times in the legislature in the promotion of the public interest, and when it created the Public Utilities Commission, later the Commerce Commission, an agency of government of another character was set up and given the power to regulate the use of the streets by railroads. In the case last cited it was held that the ordinance passed by the city after the passage of the Public Utilities act, which ordinance sought to regulate the use of headlights on street cars, was void for want of power to enact it. In *Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 Ill. 425, it was held that the General Assembly, by the passage of the Public Utilities act, withdrew from cities and villages the power to furnish crossing flagmen. To the same effect are *Hite* v. *Cincinnati, Indianapolis and Western Railroad Co.* 284 Ill. 297, and *City of Chicago* v. *O'Connell,* 278 id. 591.

The city argues that there is nothing inconsistent or repugnant between the act giving a city exclusive power to grant franchises or consents for the occupation of its streets, and the Public Utilities act, but that they should be construed together, for the reason that clause 24 of section 1 of article 5 of the Cities and Villages act and clause 5

of section 19 of the General Railroad act both provide that the consent of the city must be obtained before a commercial railroad can cross or occupy the streets of the city, and there is no provision in the Public Utilities act which purports to give the commission authority to grant such railroad the right to cross or occupy city streets without consent of the city; that clause 24 of section 1 of article 5 of the Cities and Villages act was amended and re-enacted in 1919, after the passage of the Public Utilities act; and that section 81 of the Public Utilities act of 1921 expressly denies any intent to limit or restrict the power of municipalities to grant and control the use and occupation of the streets. This provision of section 81 of the Public Utilities act of 1921, effective when adopted, is as follows: "Nothing in this act shall be construed to limit or restrict powers now or hereafter granted to cities to pass ordinances for the protection of the public health, safety, comfort, and general welfare or governing the regulation, control or occupation of streets, highways and public property within the city. Nothing in this act shall be construed to limit or restrict the powers granted to cities by this article, nor to extend the jurisdiction of the Illinois Commerce Commission over the matters covered by this article except as herein provided. Nothing in this article shall be construed to conflict with the powers conferred by this act upon the Illinois Commerce Commission, so far as the exercise of such powers by the commission is necessary or appropriate to its authority with respect to public utilities under the jurisdiction of the commission." (Smith's Stat. 1927, p. 2157.)

Clause 24 of section 1 of article 5 of the Cities and Villages act (Smith's Stat. 1927, p. 337,) provides that the city council in cities and president of the board of trustees in villages shall have the following powers: "To permit, regulate or prohibit the locating, constructing or laying a track of any horse or electric railroad in any street, alley or public place; but such permission shall not be for a

longer time than for twenty years." By the 90th clause of this section it is provided that "the city council or board of trustees shall have no power to grant the use of or the right to lay any railroad tracks in any street of the city to any steam, dummy, electric, cable, horse or other railroad company, * * * except upon the petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes."

It seems clear that the provisions of section 81 of the Public Utilities act above quoted and the provisions of the Cities and Villages act just quoted relate to the location of the tracks over and along streets and consent or license to construct tracks across or upon the streets, rather than the supervision, regulation and control of the operation of such railroads when constructed. Section 8 of article 1 of the Public Utilities act, as revised in 1921, (Smith's Stat. 1927, p. 2130,) confers upon the Commerce Commission, formerly the Public Utilities Commission, general supervision of all public utilities. It cannot be said to be the intention of the legislature that both the city and the Commerce Commission shall have jurisdiction of this matter. Where the General Assembly enacts a new statute upon any subject and it appears from the new act that it is the legislative intention to make a revision of the whole subject and to frame a new plan or scheme in relation thereto, this is, in effect, a legislative declaration that whatever is embraced in the new statute shall prevail and whatever is excluded therefrom shall be discarded. The revision of the whole subject by the new statute evinces an intention to substitute its provisions for the old law on the subject. *Northern Trust Co.* v. *Chicago Railways Co. supra; Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co. supra; Hoyne* v. *Danisch,* 264 Ill. 467; *People* v. *Freeman,* 242 id. 152; *State Board of Health* v. *Ross,* 191 id. 87; *People* v. *Town of Thornton,* 186 id. 162.

It is argued that this view takes from the city the power to fix the term of a franchise or permit for the use of the streets by a railroad or street railway and vests that power in the Commerce Commission, and that once a railroad is permitted to lay its tracks in the streets such use of the streets can be terminated only on order of the commission. Such a question is not involved in this case and is not decided. The question here involves the power to regulate the operation of certain railroads now in the streets of the appellee city, and neither the consent of the city to the use of the streets nor the charter contracts of these railroads is involved. In this case the Public Utilities Commission, now the Commerce Commission, in the exercise of the police power of the State conferred upon it by the Public Utilities act, has found that public convenience and necessity require that appellant be permitted to carry both passengers and freight over the lines of the elevated companies. This is in conformity with section 12 of article 11 of the constitution and section 22 of the Railroad act, (Smith's Stat. 1927, p. 2189,) that all railroad corporations incorporated under the general Railroad law must engage in carrying both passengers and freight. (*Litchfield and Madison Railway Co. v. People,* 222 Ill. 242; *People v. St. Louis, Alton and Terre Haute Railroad Co.* 176 id. 512.) Hearings were had on this matter in the regular way, and the city had notice of such hearing. The record shows that it appeared by its counsel and stated that it saw no objection to the issuance of the orders of the commission referred to.

Appellees contend that the city is not bound by such representation, as its counsel had no authority to bind the city council in such manner. Whether the city is bound by the consent of its counsel to the order of the commission is of no consequence here. It is admitted that it had notice and appeared at the hearing. Under section 67 of the Public Utilities act the city had a right to a review of the decision of the commission by appeal to the courts. Its remedy was

complete had it seen fit to follow it. (*Hoyne* v. *Chicago and Oak Park Elevated Railroad Co.* 294 Ill. 413.) It took no appeal and sought no review of the order of the commission, and therefore that order became final and binding on the city. Section 68 of the Public Utilities act provides that when no appeal is taken from the order or decision of the commission as provided in the act, the parties affected by such order are deemed to have waived the right to have the merits of the controversy reviewed by a court. Section 68, above referred to, also provides that where the right of appeal is waived there shall be no trial of the merits of any controversy in which such order or decision was made, by any court to which application shall be made for a writ to enforce the same, or in any other judicial proceeding. The cross-bill of the city in this case is a collateral attack on the order of the commission. *Hoyne* v. *Chicago and Oak Park Elevated Railroad Co. supra.*

Appellees argue, however, that the stipulations entered into by the elevated railroads, predecessors of the Chicago Rapid Transit Company, with the abutting property owners in the condemnation proceedings, are binding contracts and preclude such railroad companies from entering into the contracts in question with appellant. The property owners are not here complaining, but appellees cite *McCartney* v. *Chicago and Evanston Railroad Co.* 112 Ill. 611, as authority for its contention that the city may raise the question. In that case an attempt was made to grant new and extended franchise powers to a railroad company by an ordinance of the city. The railroad company was chartered by a special act of the legislature. (Private Laws of 1861, p. 487.) It was later amended by an act of the legislature making it a street railroad. (1 Private Laws of 1865, p. 597.) In 1872 the city of Chicago passed an ordinance permitting the railroad company to construct a track for passenger service, only. In 1883 an ordinance was passed giving the railroad company the right to conduct freight

traffic on its railroad without the consent of the majority of the property owners fronting upon the street being had thereto. An information was filed by the Attorney General of the State to enjoin the use of the streets by the railroad company, and the right of the Attorney General to bring such action was sustained. It was there held that the city had no power to grant the use of tracks for the operation of freight cars where the ordinance granting the right to lay the tracks limited the use thereof to passenger traffic, except on petition of the property owners on the street as required by statute, because the ordinance in effect enlarged the charter powers of the railroad company, which it had no authority to do. It was argued that no complaint could be made other than by the city or abutting property owners, but it was held that where the required consent had not been obtained the city was without power to grant the license and the exercise of it would be wholly without warrant of law and unlawful; that all of the people of the State are interested in the use of the streets as highways and authorized to bring the action. In *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510, a bill was filed by an abutting property owner to enjoin the construction of the Lake Street elevated railroad. It was held that the property owner did not have the right to enjoin the construction of the railroad because it was illegally constructed and that he had an action in damages. In *Metropolitan City Railway Co.* v. *City of Chicago*, 96 Ill. 620, the city brought a bill to enjoin the construction of a railroad on the ground that an ordinance consenting to such construction on the streets of the city was not published, as required by law, and was therefore invalid, and the right of the city to bring such bill was sustained. This court called attention to the condition of the law as it then existed, stating that the General Assembly had vested in cities, villages and towns the right to control the use of highways, streets and public grounds and to file bills to prevent and remove obstructions

from streets. So far as it relates to the subject of the general power of the cities and villages to control and regulate the conduct and operation of public utilities lawfully in the streets and highways, we have seen that the law has been changed by the Public Utilities act except as relates to the permission or consent to construct railways on the streets of the cities. In *Chicago, Burlington and Quincy Railroad Co.* v. *Abens,* 306 Ill. 69, this court held that additional railroad tracks may not be laid in the streets without the consent of the city and abutting property owners.

It is contended that the use of the elevated railroads by the appellant increases the burden, and since the ordinances hereinbefore mentioned limit such traffic to passenger traffic, this increase of burden cannot be placed upon the streets without the consent of the city and abutting property owners. The question then arises as to whether the use of these tracks already constructed, for freight traffic, constitutes an additional burden on the streets. It is conceded that no additional obstructions were placed in or over the streets or additional tracks laid by reason of the operation of appellant upon the elevated railroad structures. In *Doane* v. *Lake Street Elevated Railroad Co. supra,* it was held that elevated railroads are not an additional burden or servitude upon the streets; that they do not to any appreciable extent interfere with the use of the streets. The evidence in this case is that the operation of express cars, in which merchandise freight is hauled, has not required any additional structures over the streets nor added to the traffic on the surface of the streets nor interfered in any way with the use of the streets by the public and by the abutting property owners. There is no limitation placed on the elevated railroad company as to the number of cars it shall run over the tracks in a given time. It seems clear, therefore, that the city would have no right to interfere with the inter-corporate agreements because they permit the running of additional trains by appellant, and the only

questions, therefore, are whether it may complain of any use of the elevated railroad structures by appellant and whether it may prevent the carriage of commodities of the character authorized by the commission. The city must maintain its right to interfere with this use either on the ground of the police power, which, as we have seen, has been taken from it and vested in the Public Utilities Commission, now the Commerce Commission, or on the basis of a contract either with the abutting property owners or by reason of the ordinances which have been accepted by the elevated railroads. The State has all power necessary for the protection of the property, health and comfort of the public. This power may be delegated by the State to municipalities in such measure as may be deemed desirable for the best interest of the public, and the State may resume that power again when deemed expedient. (*Harmon* v. *City of Chicago,* 110 Ill. 400.) In *Public Utilities Com.* v. *City of Quincy,* 290 Ill. 360, the Quincy City Railway Company accepted a so-called franchise ordinance from the city which fixed the rates for street railway service for a period of twenty years. Thereafter the Public Utilities Commission changed those rates. In an appeal from the action of the commission to the circuit court of Sangamon county the city contended that the State did not retain power to regulate the fare to be charged on street railways as it had granted the right to cities to regulate and control by ordinance the operation of street railways in cities, and the question was whether, after an ordinance has been passed by a city under that power and accepted by a street railway company, the State can thereafter override or change any provisions of such ordinance. It was there held that the regulation of public utilities is within the exercise of the police power of the State; that cities have no power to make contracts as to rates which cannot be changed or amended by the Public Utilities Commission. In *Commerce Com.* v. *Omphghent Township,* 326 Ill. 65,

it was held that neither franchise ordinances of cities which have been accepted and acted on by grantee utility companies, nor regulatory ordinances of cities under legislative authority, nor private contracts, can be permitted to stand in the way of the lawful exercise by the Commerce Commission of the regulatory powers conferred upon it by law. In the opinion in the latter case numerous other decisions of this court hereinbefore discussed are cited. In *City of Chicago* v. *O'Connell, supra,* it was held that section 4 of article 11 of the constitution gives to a city the control or operation of street railways on its streets only to the extent of determining whether street railways shall be operated on the streets of the city, and if so, upon what streets, and that the city has no power to contract away any of the police powers delegated to it by the legislature but that that matter rests in the Public Utilities Commission and is subject to its control. It may be taken as definitely settled in this State that the regulation of service by utilities is under the control of the Commerce Commission. In this case the city might have procured a review of the order of that commission, but it did not do so. Objections here raised to the order of the Public Utilities Commission might have been urged before that body or before the courts on review. This not having been done this court cannot now provide the relief sought by the city. With the policy of the Public Utilities act this court has nothing to do. That is a matter resting entirely with the legislature. Under this view of the case it does not become necessary to consider other questions raised in the briefs of counsel.

For the reasons indicated the superior court erred in granting the injunction prayed in the city's cross-bill and in denying the injunction sought by appellant. The decree is therefore reversed and the cause remanded, with directions to dismiss the cross-bill and to grant the relief prayed in appellant's bill.

*Reversed and remanded, with directions.*