(Nos. 25930, 25933.—

THE CITY OF GENESEO, Appellant, *vs.* THE ILLINOIS NORTHERN UTILITIES COMPANY, Appellee.—THE VILLAGE OF HEYWORTH, Appellant, *v.* THE CENTRAL ILLINOIS ELECTRIC AND GAS COMPANY, Appellee.

*Opinion filed November 24, 1941.*

STONE and SHAW, JJ., dissenting.

JOSEPH L. SHAW, and RICHARD M. O'CONNELL, (THOMAS A. MATTHEWS, A. L. STODDARD, C. L. EMRICH, R. Z. HICKMAN, ANAN RAYMOND, POPPENHUSEN, JOHN-

STON, THOMPSON & RAYMOND, and ALBERT E. JENNER, JR., of counsel,) for appellants.

ISHAM, LINCOLN & BEALE, WILSON & MCILVAINE, DIXON, DEVINE, BRACKEN & DIXON, HENRY WATERMAN, and GOTTLIEB & SCHWARTZ, (DAVID F. TABER, CLAUDE A. ROTH, HARRY J. DUNBAUGH, CLAY JUDSON, JOHN P. DE-VINE, EDWARD M. BULLARD, and HARRY E. SMOOT, of counsel,) for appellees.

GEORGE F. BARRETT, Attorney General, (HARRY R. BOOTH, of counsel,) for the Illinois Commerce Commission.

SIDLEY, MCPHERSON, AUSTIN & BURGESS, HENRY C. WARNER, ALBERT A. BARNHARD, BRACKEN, LIVINGSTON, MURPHY & BARGER, CHARLES E. FEIRICH, MILLER, WES-TERVELT, JOHN & GUENTHER, PATTON, ALLEN & CONVERSE, POPE & DRIEMEYER, QUINN, QUINN & O'HERN, SINNETT & BRITTON, STEVENS & HERNDON, WILFRED ARNOLD, BEN B. BOYNTON, BRAWDER & ALLEN, CHARLES H. GREEN, KIGER & DILSAVER, J. A. RIORDON, ROSS & WATTS, G. R. SCHWARZ, JOSEF T. SKINNER, SMITH & BROWER, and FRANKLIN J. STRANSKY, (KENNETH F. BURGESS, JAMES F. OATES, JR., and LESLIE N. JONES, of counsel,) *amici curiae.*

Mr. JUSTICE GUNN delivered the opinion of the court:

These consolidated cases are appeals from the orders of the circuit courts of Henry and McLean counties, which affirmed the orders of the Illinois Commerce Commission dismissing the complaints of appellants. The issues in the two cases are identical, and the material allegations of each complaint are admitted by the answers. In each case the municipality granted to the electric public utility company a franchise or license to place its poles and other electric facilities upon, under or in the streets of the municipality

for a definite number of years, which franchise was accepted by the utility company and service rendered thereunder. Later, each municipality erected and was operating its own municipally owned electric light plant. The franchises of the two utilities companies expired by the lapse of time prescribed in the ordinances granting them. When these franchises expired the utilities companies refused to remove their facilities from the streets, and each municipality passed an ordinance ordering the respective companies to do so. Each utility continued to serve its customers and also patrons outside of the limits of the municipalities. Each municipality filed a complaint with the Illinois Commerce Commission praying that the privately owned public utilities be ordered to vacate the streets of each municipality and remove therefrom all of their poles, wires and facilities, and to cease doing business in each by supplying the inhabitants with its product. These complaints were filed with the commission after suits for mandatory injunctions in the several circuit courts had been dismissed, following our decision in *City of Geneseo* v. *Illinois Northern Utilities Co.* 363 Ill. 89.

The Commerce Commission took the position that the former *Geneseo case* settled the issues in this case. In its order and findings, among other things it said: "We conceive the effect of the Supreme Court decision in the *Geneseo case* to be that the question of whether or not a public utility should discontinue service in the municipality after the expiration of its ordinance is a matter to be determined by this commission and that such determination should be made in accordance with the just and reasonable requirements of public convenience and necessity, that is, whether or not the respondent public utility now serves a useful purpose in the village of Heyworth as contemplated by the Public Utilities act," etc. Among its findings is the following: "That public convenience and necessity does not require the termination or modification of that part of the

certificate heretofore mentioned concerning the village of Heyworth; that its service in said village is in the public interest; and that the prayer of said complainant that said respondent company be required to vacate the streets, alleys and other public places of said village of Heyworth and remove therefrom all of its poles, wires and other appliances and to cease doing business in said village and to cease supplying the inhabitants thereof with electric energy, for heat, light and power, should be denied and the complaint dismissed." A similar order was entered in the Geneseo case.

Counsel for appellants state the question involved to be the right and power of a municipality to control and license the entry upon its streets by a public utility, and to terminate such occupation at the time the franchise or license expires. In a broader sense the implication is more extended, as the position taken by appellees amounts to construing the power of the Illinois Commerce Commission to have supervision, regulation and control over the streets of the city by statutory language granting only supervision over utilities.

At the outset it is claimed that the case of the *City of Geneseo* v. *Illinois Northern Utilities Co. supra,* has adjudicated the issue presented in this case. That was a complaint brought by the city for a mandatory injunction to compel the utility to remove its facilities from the streets. It is to be noted that in the former *Geneseo case* the issue was raised on a motion to strike the answer. The answer set up three propositions: (1) That the defendant was a public utility operating under the statute and within the jurisdiction of the Commerce Commission; (2) that the requirements of the Public Utilities act prohibit the defendant, without the consent of the commission, from ceasing to furnish electric service to the plaintiff and prohibits the city from removing transmission facilities from the street unless authorized by the commission; (3) that the

city is without legal authority to prohibit the use or occupation of the streets in the city by the defendants for its distribution system, and is without authority to maintain the suit. After reciting these three grounds in the answer the court, in its opinion, stated that the issue presented was whether the plaintiff could maintain the action. The judgment of the court remanded the cause to the circuit court, with directions to overrule the motion to strike the answer.

There were three issues presented, some of which would foreclose further action, and some of which would not. The second ground set forth, that the utility could not remove its facilities from the streets without authority from the Commerce Commission, is not involved in the third objection that the city is without legal authority to prohibit the use or occupation of the streets by a utility, because a a total lack of power would prevent any action in that regard by the city, whereas removal could be required on the second ground if it appeared to the Commerce Commission it was desirable or necessary for the utility to abide the demand of the city. One ground presents a limitation upon the utility, the other upon the municipality.

The burden of establishing an estoppel by judgment is upon him who invokes it, and to so operate it must either appear upon the face of the record or be shown by extrinsic evidence that the precise question was raised in determining the former suit. In *Russell* v. *Place,* 94 U. S. 606, it is said: "If there be any uncertainty on this head in the record—as, for example, if it appear that several distinct matters may have been litigated, upon one or more of which the judgment may have passed, without indicating which of them was thus litigated, and upon which the judgment was rendered—the whole subject matter of the action will be at large, and open to a new contention, unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined."

In *Sawyer* v. *Nelson,* 160 Ill. 629, where three counts in a declaration were involved, which set up different causes of action, and there was nothing appearing upon the record to indicate upon which count judgment was rendered, or any extrinsic evidence offered to show that the judgment was based upon a certain count, this court held there was nothing to show there had been a precise adjudication of the facts alleged in any one of the counts. The same principle has been sustained in *Kitson* v. *Farwell,* 132 Ill. 327, *Chicago Theological Seminary* v. *People,* 189 id. 439, *Markley* v. *People,* 171 id. 260, *Jernberg* v. *Mix,* 199 id. 254, and *People* v. *Wyanet Electric Light Co.* 306 id. 377. In the last case objections in a tax proceeding raised an issue that the property was not taxable, and also that the assessment was void because made without notice or a hearing, the judgment merely sustaining objections without making any findings as to the facts in issue. In a later proceeding to collect the same tax in a subsequent year, it was held the former judgment was not an estoppel by verdict or *res judicata* on the question of fact involved in the issue as to whether the property was taxable. It would, therefore, appear that if either the first or second matters set up in the answer in the original *Geneseo case* were sufficient to deprive the court of jurisdiction there would not necessarily be an adjudication upon the third proposition, that a city is without legal authority to prohibit a utility to occupy its streets if it obtains a certificate of convenience and necessity from the Commerce Commission, because there is no showing upon which ground the decision was based.

Moreover, it also appears that the issue presented was one of jurisdiction of the circuit court which might be ousted upon proof of the facts establishing any one of the three reasons set forth in the answer. Dismissal of a cause of action on the ground that the court has no juris-

diction is not a decision on the merits which will bar another action. (*St. Boniface Church* v. *Wolf,* 302 Ill. 204.) The first and second pleas of appellee would not bar further action by the city before the commission, and there being nothing in the judgment rendered to show upon which ground it was entered, the former *Geneseo case* is not conclusive.

This requires us to examine the merits of the present controversy, which, as pointed out above, goes to the direct question as to whether a municipality has any right to refuse the occupation of its streets to a utility, or, after a franchise has expired, the right to oust it, or require it to be ousted from such occupancy.

Counsel for appellees and for *amici curiae* have urged with great earnestness that the former decisions in this court are *stare decisis* of this question, and if this be true we should depart therefrom with great caution and reluctance. It is asserted by appellees that the previous holdings of this court have laid down the general principle that, in all respects, the authority of the Commerce Commission to supervise utilities is so exclusive in its nature that it has completely deprived a municipality of the exercise of any rights which would interfere with a utility's operation under a certificate of convenience and necessity of the Commerce Commission.

There is no argument against the proposition that wherever the Public Utilities act has granted a specific right or power which may conflict with a like right or power enumerated among those of cities and villages the former will prevail as a repeal, by implication, of such rights vested in the municipality. This is not necessarily true where there is merely such a conflict between the granted powers of the respective governing bodies that part may remain in effect and part remain uneffected.

Examination of the decisions of this court prior to the decision in the first *Geneseo case* discloses, in every instance

but one, that the superior jurisdiction of the Commerce Commission was based upon an express authorization contained in the Public Utilities act, which was in opposition to a previous right existing in the municipality. In *Stephens* v. *Chicago, Burlington and Quincy Railroad Co.* 303 Ill. 49, it was held a highway commissioner no longer had jurisdiction over a railroad crossing and highway, because the sole power to make the change in such a crossing was vested in the Commerce Commission by section 58 of the Public Utilities act. In the *Village of·Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 Ill. 425, a village ordinance regarding a flagman, in a negligence case, was held ineffective because of the requirement of section 32 of the Public Utilities act that a railroad use safe instrumentalities, and that section 57 of the same act, giving the commission power to require safety devices to protect the public, superseded the ordinance authorized under paragraph 65.26 (article 5) of the Cities and Villages act. In *Northern Trust Co.* v. *Chicago Railways Co.* 318 Ill. 402, in like manner a headlight ordinance was held ineffective because of the provisions of section 32, and the power given the commission by sections 49 and 57 of the Public Utilities act. In *City of Witt* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 324 Ill. 494, it was held that section 57 of the Public Utilities act superseded the authority of a city to enact an ordinance limiting the speeds of trains. The case of *Commerce Com.* v. *Omphghent Township,* 326 Ill. 65, involved a highway crossing where it was held no duty was left in the highway commissioner but was all vested in the commission under sections 57 and 58 of the act. *County of St. Clair* v. *Pennsylvania Railroad Co.* 342 Ill. 646, involved a separation of grades of a railroad, power to authorize which is specifically given by section 58 of the Public Utilities act, and no question of conflict of power was claimed because the county was the petitioner to bring about the change.

In *City of Altamont* v. *Baltimore and Ohio Railroad Co.* 348 Ill. 339, there was involved the violation of a village ordinance requiring a railroad to maintain flagmen at street intersections. It was held the commission had authority to act by reason of the provisions of sections 57 and 58 of the Public Utilities act, following *Northern Trust Co.* v. *Chicago Railways Co. supra.* The case of *City of Chicago* v. *Great Western Railroad Co.* 348 Ill. 193, involved a city ordinance for weighing railroad cars, authorized by paragraphs 65.54 and 64.55 (article 5) of the Cities and Villages act, but it was held section 52 of the Public Utilities act, which granted the commission specific powers for regulating weighing, superseded them. The case of *City of Chicago* v. *Commerce Com.* 356 Ill. 501, involved a petition by the city for an order from the commission requiring a railroad to effect a change of grade in city streets. This authority is specifically granted to the commission by section 58 of the Public Utilities act.

It is to be observed that section 32 of the Public Utilities act is a general requirement that the utility shall provide equipment, facilities and service as will promote the safety, health and convenience of its patrons, employees and the public. There is nothing in this section, standing alone, that limits the power of a city in the matters considered in the above cases. It is the authority granted the Commerce Commission by other sections which does interfere with the power of a city in those respects, that brings about this result. The power granted the Commerce Commission by sections 49, 52, 53, 54, 57 and 58 is direct, special and necessarily exclusive. The grant of power in these sections is: "The commission shall determine and prescribe;" "The commission shall have power;" "the commission shall have authority to prescribe," and words of similar import, vesting specific authority to do the several things enumerated therein.

In each of the above cases the court held there was a specific grant of authority to the Commerce Commission giving it jurisdiction over something which before that time had been within the jurisdiction of a city or village. There was no doubt about a conflict of authority. The provisions of the statutes were in direct opposition to each other, and under the well-settled principles of statutory construction the powers granted the Commerce Commission became the dominant ones without a specific repeal of the conflicting statutory powers granted cities and villages. There was no question in those cases of inferring a grant of power in the commission, and no question but that there was a direct conflict in which one or the other was superior. The legal proposition to be adduced from these decisions, and which has become *stare decisis,* is that wherever there is a specific power or authority granted to the Commerce Commission, which is in opposition to a like or similar power granted the city or village the former will prevail, and the latter, without express repeal, will become ineffective. To this extent, and this extent only, has the principle established in the above cases become *stare decisis.*

It now devolves upon us to determine whether there was anything in the remaining cases which hold the city is deprived of all rights over its streets and public places so far as a refusal to permit a utility to occupy streets conflicts with a certificate of convenience and necessity granted by the Commerce Commission to use such streets in opposition to the will of the city.

In *Chicago, North Shore and Milwaukee Railroad Co.* v. *City of Chicago,* 331 Ill. 360, the point in issue was whether a railroad company, which had a franchise for passenger purposes, could be authorized by a certificate of the Commerce Commission to transport freight, over the objection of the city. That case held that the Commerce Commission, by virtue of the authority given to it, was

given the right to regulate railroads, and that the effect of this grant of power was to eliminate from paragraph 65.23 (article 5) of the Cities and Villages act the word "regulate" where it granted the following powers: "To permit, regulate or prohibit the locating, constructing or laying a track * * * in any street, alley or public place," but further specifically held that the question whether the use of a street by a railroad under a franchise could be terminated only on the order of the commission was not in the case, and that the only question involved was the right of regulation. This decision upheld the power of the commission to regulate the operation of a railroad, and, in so doing, held neither the consent of the city to use of the streets, nor the charter contracts of the railroad, were involved. This case does not recognize the commission's exclusive power over the occupation of the streets by a utility.

The case of *Chicago Motor Coach Co.* v. *City of Chicago,* 337 Ill. 200, is decided upon a different ground. In that case motor coaches commenced operating on the streets of Chicago without a franchise or license, and the city enacted an ordinance declaring it to be illegal to operate motor buses as common carriers without having obtained a grant or license from the city. An injunction suit was brought by the motor coach company to restrain the enforcement of the ordinance. As the basis of its decision the court held that the city never had any right under any of the powers granted to it by the legislature to prohibit the operation of automotive vehicles on the city streets, and while it had power, under paragraph 65.8, to regulate the use of the streets by such vehicles, regulation was inconsistent with prohibition or exclusion. The court then held, by virtue of the several provisions of the Public Utilities act, that the Chicago Motor Coach Company had a right to operate upon obtaining a certificate of convenience and necessity from the Commerce Commission. While no franchise or license to operate a public utility was involved

in this case, the language of the decision is broad enough to sustain the contention made by appellees. This case, together with the comments contained in the former *Geneseo case,* are, therefore, the only direct authority for the contention that the Public Utilities act has taken from cities all power to permit or prohibit the use of a street by a public utility, as distinguished from the right to regulate a public utility operating in the street under a license or franchise granted by the city.

A judicial opinion, like a judgment, must be read as applicable only to the facts involved, and is an authority only for what is actually decided. (*People* v. *Chapman,* 370 Ill. 430; *White* v. *Seitz,* 342 id. 266.) The holding in the *Chicago Motor Coach Co. case* did not involve the question whether power had been granted the Commerce Commission to control the occupancy of the streets of a city, and hence any language used which might pass upon that question would not be authority in a case where the point was actually at issue.

No other case has been called to our attention dealing directly with this subject, although *City of Chicago* v. *Hastings Express Co.* 369 Ill. 610, holds that the city may impose a wheel tax upon a motor transportation company, notwithstanding it is operating under a certificate of convenience and necessity from the Commerce Commission.

The issue involved in this case has never been before this court under circumstances where it was necessary to pass upon rights, if any, retained in the streets of the city with respect to the permission or prohibition of the use thereof by a public utility. Comments in any of the cases respecting this subject were not relevant to the issue presented in the case. The subject is essentially one of the construction and interpretation of statute law.

Article 5 of the Cities and Villages act (Ill. Rev. Stat. 1939, chap. 24, p. 383) granted cities certain powers over its streets by the following provisions: Paragraph 65—

power to control the finances and property of the corporation; paragraph 65.8—to regulate the use of the streets; paragraph 65.9—to prevent and remove encroachments upon the same; paragraph 65.13—to regulate the use of sidewalks and all structures thereunder; paragraphs 65.27, 65.28—power to construct tunnels, bridges, viaducts, culverts, drains, sewers and regulate the use thereof; paragraph 65.17—to regulate and prevent the use of streets and sidewalks and public grounds for signs, sign posts, awnings and awning posts, telegraph poles, horse troughs, racks, posting handbills and advertisement; paragraph 65.99 —to regulate space over streets; paragraph 65.101—to pass all ordinances, rules and make all regulations proper or necessary to carry into effect the powers granted to cities and villages. These several powers have been held to authorize cities and villages to regulate and control the use of their streets and this included the right to grant to or to withhold that use from utilities. (*Sears* v. *City of Chicago,* 247 Ill. 204; *City of Quincy* v. *Bull,* 106 id. 337; *Chicago Municipal Gas Light Co.* v. *Town of Lake,* 130 id. 42; *Gridley* v. *City of Bloomington,* 68 id. 47; *People* v. *Clean Street Co.* 225 id. 470.) This power has been sustained since the passage of the Public Utilities act. *People* v. *Chicago Motor Bus Co.* 295 Ill. 486; *City of Springfield* v. *Interstate Telephone Co.* 279 id. 324.

Examination of the Public Utilities act shows an intent upon the part of the legislature to grant general supervision by the Commerce Commission over all classes and types of utilities, and to give specific and express authority in certain instances where a general power might be ineffective as conflicting with specific authority vested elsewhere. This is apparent from the framework of the act. The first seven sections are devoted to organization of the commission; the eighth section is the one which vests the power in the following language: "The commission shall have general *supervision* of all public utilities, except as otherwise pro-

vided in the act." The statute also lays down certain duties upon the part of utilities by sections 32 to 40, and then the act provides from sections 41 to 58, inclusive, certain specific powers which the commission may exercise after a hearing, among which are: To establish rates (secs. 41, 42); file objections with Interstate Commerce Commission to adjust discriminatory interstate rates (sec. 43); power to order the railroads to make connections with each other (secs. 45, 46); power over or right to require continuous lines of communication (sec. 47); power to acquire subways, conduits, or compel the use thereof (sec. 48); authority to direct the nature of the facilities to be used by utilities (sec. 49); to compel the building of extensions (sec. 50); to regulate the number of trains or cars to be used (sec. 51); regulations for temporary storage and weighing (sec. 52); what may be included in the service contract of customers (sec. 53); standards of service that may be furnished (sec. 54); power to establish rules to promote safety and to require the use of protective signals and devices (sec. 57); control over grade crossings (sec. 58); all of which specific powers are fully defined and set forth in the enumerated sections of the act.

It is plain that much of this authority which the commission may exercise is in direct opposition to authority which had previously been vested in cities, townships, road commissioners or counties, and, to that extent at least, such previously existing authority in the municipalities has, by implication, been repealed. All of the cases dealing with this subject, except that of the *Chicago Motor Coach Co. case, supra,* and the *Geneseo case, supra,* were decided as they were because a right was claimed upon behalf of a municipality which had been expressly granted to the Commerce Commission. It is to be noted, however, that nowhere is there to be found in the act express power taking from the city the "right to permit * * * or prohibit the use of any street, alley or public place within a city."

The use of the words "supervision of utilities" granted the commission is recognized as being insufficient for all purposes by supplementary powers granted for specific purposes. Supervision means the act of overseeing, inspection or superintendence (*Webster's International Dict.*) and was so used in the act, giving a board general supervision of railroads. *State* v. *Fremont, etc. Railroad Co.* 22 Neb. 313, 35 N. W. 118; *Rock Island Railroad Co.* v. *Department of Labor,* 256 N. Y. 498, 177 N. E. 17; *State* v. *Chicago, Milwaukee and St. Paul Railroad Co.* 152 Iowa, 317, 130 N. W. 802.

No language, specific or otherwise, is found in the statute giving the Commerce Commission power or authority to superintend, regulate or control the streets of a city, or suspend its power to license or prohibit the occupancy thereof. On the other hand, there are several provisions in the Public Utilities act which indicate the absence of such intention. In section 8, where general supervision is granted the commission over utilities, it is also provided that the commission shall keep itself informed as to the utility's general condition, franchise, capitalization, etc., not only with respect to the adequacy and security afforded by the service, but also with respect to the utility's compliance with the provisions of the act, and with the *charter* and *franchise requirements.*

The franchise, license or permit issued by a municipality is not only mentioned in section 8 but is specifically mentioned in sections 10, 21, 27, 27-c, 27-d, 27-e, 28 and 29 in various ways in connection with capitalization, transfers, assignments, mergers and other transactions in which the franchise and license rights of a utility are considered as a part of the property of the corporation which comes under the supervision of the commission. The final sentence in section 29, which governs assignments of franchises, repels the inference that a power to approve such assignments vests any power over the franchise, for these words are

used: "Such permission shall not be construed to revive or validate any lapsed or invalid franchise, license, permit or right, or to enlarge or add to the powers and privileges contained in the grant of any franchise, license, permit or right, or to waive any forfeiture." The language limiting the effect of the regulation of a utility in the use of its franchise is specific in providing there shall be no encroachment upon the rights of the municipality in respect to the legality of the franchise. An examination of these sections plainly shows that the commission was not given any power over the use of the franchise or permit, but only over the *acts of the utility* exercised by reason of the franchise or permit. The sentence just adverted to specifically provides that the action of the commission cannot "enlarge or add to the powers and provisions contained in the franchise." The same limitation is to be found in section 55 of the act, which authorizes the commission to grant certificates of convenience and necessity, the last part of which reads: "No certificate of public convenience and necessity shall be construed as granting a monopoly or an exclusive privilege, immunity, or franchise." The language of section 55, taken in connection with that of section 29, would at least leave doubt on the question whether a city was deprived of the right to permit or prohibit the use of a street under a license or franchise. This doubt would appear to be entirely eliminated by the language of section 81 which reads as follows: "Nothing in this act shall be construed to limit or restrict the powers now or hereafter granted to cities to pass ordinances for the protection of the public health, safety, comfort and general welfare, or governing the regulation, control or occupation of streets, highways and public property within the city," etc.

If the matters just referred to were all that was contained in the statute it could not be seriously contended that the Commerce Commission had jurisdiction to control the streets of the city for the purpose of permitting a public

utility to occupy it in the first instance, or to continue its occupation after a franchise or license had expired. It is contended, however, that the portion of section 81, just referred to, has reference only to cities which are authorized by virtue of article 6, consisting of sections 81 to 86 of the act, to adopt its provisions and install its own municipal utilities and be exempt from regulation of the Commerce Commission. But this contention is not sound, because section 81 evidently contemplated there were, with respect to utilities, two classes of cities created, those adopting article 6, and those which did not adopt it. With respect to the former it is provided that nothing in the *act* shall be construed to limit or restrict the powers granted to a city by the *article*. With respect to the other class of cities it is provided that nothing in the act shall be construed to limit or restrict the power granted to cities to govern the regulation, control or occupation of streets, highways and public property within the city, and likewise with respect to the Commerce Commission it is provided that nothing in article 6 shall be construed to conflict with the powers of the commission so far as the exercise of such powers by the commission is necessary with respect to utilities under the jurisdiction of the commission.

It is clear that the words "act" and "article," in section 81, are used designedly, so as to repel any inference contained in the provisions of the balance of the act. The powers granted to a city adopting article 6 are not limited by anything else in the act. Likewise any inference which might be raised by the failure of a city to adopt article 6 is repelled by the express provision that the act shall be not construed as limiting any power to regulate streets or highways which is now or hereafter granted to cities. Moreover, the inclusion of this reservation in favor of the city that had by vote adopted the provisions of article 6 would be unnecessary and absurd because, by the adoption of the act, all control of the Commerce Commission over the city

is terminated. The effect of the provision is to make it an integral part of the Public Utilities law so far as it affects cities not electing to come under article 6, and to be construed in connection with all other provisions of the act, affecting such cities.

It is, however, very vigorously claimed that the addition, in 1935, of section 49-a, has created a situation which renders it impossible for the Commerce Commission to exercise its powers, except that it have such control over streets and highways in cities and villages. So far as is pertinent section 49-a is as follows: "No public utility shall abandon or discontinue any service without first having secured the approval of the commission. In granting its approval the commission may impose such terms, conditions, or requirements as in its judgment are necessary to protect the public interest," etc.

It is assumed that the prohibition contained in this section gives power to the commission to disapprove an abandonment or discontinuance of service by a utility whose franchise has expired, and is, therefore, in direct opposition to the power granted a city to permit or prohibit the use or occupancy of a street. The argument would have more force if this section were made to apply only to a case where the franchise of a utility had expired. Reflection discloses that there are several situations which may arise, some of which we know as a matter of common knowledge have arisen, which made the addition of this section to the Public Utilities act necessary. As pointed out above, section 8 of the act requires the Commerce Commission to keep informed as to the general condition of utilities including the franchise, and also "to keep informed as to how they are managed with respect to compliance with * * * the charter and franchise requirements." "Abandon" and "discontinue" as used in this statute have somewhat different meanings. Abandon means to relinquish or give up with intent of never again reserving or claiming one's rights

or interest. (Webster's New International Dict.; *Gay* v. *State,* 105 Ga. 599, 70 Am. St. Rep. 68; *Losei Realty Corp.* v. *City of New York,* 254 N. Y. 41, 171 N. E. 899; *Roth* v. *Mutual Reserve Life Ins. Co.* 162 Fed. 282.) It is a voluntary act. (*Pidgeon* v. *Lamb,* 133 Cal. App. 342, 24 Pac. (2) 206; *The Port Hunter,* 6 Fed. Supp. 1009.) An involuntary act is not an abandonment. (*City of Los Angeles* v. *Abbott,* 217 Cal. 184, 17 Pac. (2) 993.) Discontinue may be a voluntary act, but may be brought about against the will of a person. (*In re Michigan Motor Specialties,* 288 Fed. 377; *Warren & Lanier* v. *Cash,* 143 Ala. 158, 39 So. 124.) Discontinue means to cease using, to interrupt continuance of. Webster's New International Dict.

A utility may determine to abandon service before the franchise has expired, in which case the original act· gave the commission the right to keep informed, but did not give it power to compel performance. The city may file a complaint with the commission under section 64 asking that it direct a utility to discontinue service because its franchise had expired, which would not only enable the utility to procure the necessary consent to discontinue under section 49-a, but also keep the commission informed of the matters required by statute. A like situation may arise where the city has consented to the extension of a franchise or license which the utility does not wish to accept.

In performance of the duties required by section 8 to keep informed as to financial conditions, the Commerce Commission should have the right to enter on its records when a utility has discontinued service, because of its control over the issuance and approval of securities or other financial operations in which the public is interested. A further reason for the enactment of section 49-a is for the purpose of settling questions arising between the utility and the public by reason of such termination of service, and in determining the steps necessary to protect the public in the transfer of the service from the company ceasing operations to one that may be available to take over the service.

There is a notable difference between the provisions of section 49-a of the Public Utilities act and the provisions of the act previously reviewed and construed by this court. Section 49-a is directed against the utility. It creates an additional feature of utility management over which the Commerce Commission has supervision. It affects only the operation of the utility.

On the other hand, sections 41 to 58 give the Commerce Commission certain express power or authority over matters formerly within the control of cities, such as, for illustration, the regulation of weighing of cars is vested by section 52 of the Public Utilities act in the Commerce Commission, when formerly it was within the power of the city under paragraphs 65.54 and 65.55. There is a direct conflict of authority. There is no such power given the commission by section 49-a.

With these broader concepts of the application of section 49-a it is apparent it does not conflict with the right of the municipality to permit or prohibit the use of a street, but is merely a regulation which will prevent the utility from abandoning or discontinuing service without notice to the commission, but, when necessary, it will do so under regulations creating the least inconvenience to the public. For the Commerce Commission to perform this service it is therefore necessary that application be made to the commission, as provided in this section, either by the utility, where it seeks to voluntarily abandon, or by the city when demanding a discontinuance, but it does not grant any power to the commission to exercise a right of occupancy of a street contrary to the terms of a franchise, or without such a franchise.

In a case such as the present one, where the city has a utility in full operation, capable of furnishing the public with the service heretofore required of the company, the question of continuing in the street is not one that may be authorized by the Commerce Commission, but its province is limited to a discontinuance of the service under the

terms and conditions creating the least inconvenience to the public, and authorizing means by which other territory served outside of the territory covered by the franchise will not be unduly interrupted. When the commission is satisfied that the term of a franchise or a license for the occupancy of streets or other public places in the city has terminated, the commission shall so find, and, in its order authorizing discontinuance, provide the steps bringing about this result with as little inconvenience as possible. On the other hand, when the utility still retains the right to occupy the streets under a franchise from the city, and wishes to abandon service, jurisdiction is given to the Commerce Commission to see that the charter and franchise requirements are complied with. The power given is the regulation of a utility and not a regulation of the occupancy of the streets of a city.

Some contention is made that section 58, as amended, has deprived a municipality of its right to exercise control over its streets or public places. This section, as amended, has only extended the powers that were granted by the same section in the act of 1913. The most that could be claimed under this section would be that the power vested in the Commerce Commission was superior over a crossing during the term of a franchise. When the terms of a franchise or permit expired and the utility vacated the streets, there would be nothing left for the Commerce Commission to supervise. It is not inconsistent to construe section 58 as vesting power in the Commerce Commission to regulate crossings of streets and public utilities during the term of a franchise, but there is no language in it indicating that because the power may be exercised during such term it may authorize a utility to continue to occupy the streets after its franchise right therein had ceased. Such construction creates no interference or overlapping of authority between the municipality and the commission. So it has been held that the imposition by a city of a wheel tax upon a

motor transportation company in the public utility business is not invalid by reason of the fact the utility is subject to supervision by the Commerce Commission. *City of Chicago* v. *Hastings Express Co. supra.*

Repeals by implication are not favored. It is only when there is a clear repugnancy and both acts cannot be carried into effect that the former is repealed. (*People* v. *Burke,* 313 Ill. 576; *People* v. *Czarnecki,* 256 id. 320.) Statutes which are seemingly repugnant should, if possible, be so construed that the subsequent act may not operate to repeal by implication the earlier act. (*People* v. *Board of Education,* 349 Ill. 390; *People* v. *Shader,* 326 id. 145.) Where a special act is repugnant to or inconsistent with a prior general statute a partial repeal of the latter will be implied or exception grafted upon the general statute. (*People* v. *Missouri Pacific Railroad Co.* 342 Ill. 226.) In determining whether one statute is repugnant to another the court should consider its several parts in connection with correlated sections *in pari materia.* (*People* v. *Board of Education, supra.*) The repeal by implication of one act by a later act is not effected by mere conflicts or inconsistencies between them, but only where the carrying out of the later act prevents the enforcement of any part of the former. To the extent they are in conflict the first act is repealed, but the parts of the first act not affected remain in full force and effect.

A clear illustration of this principle is to be found in *City of Geneseo* v. *Shearer,* 326 Ill. 82. The State Highways act authorized the Department of Public Works and Buildings to construct and maintain hard roads within the corporate limits of cities and villages and towns. It was held this statute did not deprive the cities or villages of the power to improve a street designated as a portion of a State road. It was claimed that the statutes were in conflict, and that the Hard Road statute superseded the Local Improvement act. It was said in that case: "The act

being here considered refers neither to the Local Improvement act nor to the Cities and Villages act, and hence there is no expressed intention that the power of cities and villages to improve their streets has been abridged. If the legislature intended to deprive cities and villages of the right to construct pavements by special assessment in streets over which a State bond issue road passes, undoubtedly it would have clearly and positively expressed such purpose and intention."

The *Shearer case* refers to *Village of Glencoe* v. *Hurford,* 317 Ill. 203, where the same question was under consideration arising out of an earlier Road act and the same result was reached, and where it was also said: "It is a well-established rule in construing statutes, that when great inconvenience or absurd consequences will result from a particular construction, that construction should be avoided unless the meaning of the legislature be so plain and manifest that avoidance is impossible. When the literal enforcement of a statute would result in great injustice and lead to consequences which the legislature could not have contemplated, the courts are bound to presume that such consequences were not intended and will adopt a construction which it may be reasonable to presume was contemplated by the legislature."

It is our view that the power vested in cities to permit or refuse a license or franchise to a public utility has not been repealed by the provisions of the Public Utilities act, and anything said to the contrary in *City of Geneseo* v. *Illinois Northern Utilities Co. supra,* or *Chicago Motor Coach Co.* v. *City of Chicago, supra,* is not adhered to.

Cities are authorized and empowered by the statute to do many things that affect its streets, highways and public places. Among these many powers as found in the Cities and Villages act, or construed by this court to be involved within such powers, are the right to pave its streets; to regulate traffic and parking; to enact zoning ordinances; policing of the city; to build bridges, viaducts, tunnels

and sewers; to select streets for through or local traffic; and to provide for underground laying of wires or other facilities. These, and many others, are all in addition to the powers to permit or refuse the occupancy of its streets by franchise or license, and would be seriously affected or destroyed if the Commerce Commission should be held to have the exclusive right of control of the use of streets by a public utility. If the Commerce Commission has the power to extend a franchise which has expired, by its certificate of convenience or necessity, the right to authorize a utility to occupy or take possession of a street without a franchise or license necessarily follows.

When we see the care the legislature has taken to give the Commerce Commission general supervision over utilities, and has granted a special power to it in each case where the general authority of the city would otherwise prevail, the absence of power granted by express words to control the occupancy of streets, except in accordance with a franchise issued by the city, is of the greatest significance. We are of the opinion the power claimed by appellees to exist in the Commerce Commission has not been given by the legislature.

Appellees urge that this court has no jurisdiction to pass upon the order of the circuit court confirming the decision of the Commerce Commission. This position seems somewhat inconsistent. In the first *Geneseo case* it was insisted that the courts had no jurisdiction of the matter, and that the Commerce Commission did have jurisdiction. This was set up in the answer. Upon motion the answer was stricken. Upon appeal to this court it was ordered that the cause be remanded with instructions to overrule the motion to strike. Parties then proceeded before the Commerce Commission. It conducted a hearing and entered an order. The effect of that order was it had complete power and authority to determine whether or not the appellees could occupy the streets of the two municipalities involved without a franchise or license to do so. This directly in-

volves the reasonableness or lawfulness of the order or decision of the Commerce Commission. Section 68 of the Public Utilities act provides that any one affected by the action of the Commerce Commission may appeal for the purpose of having the reasonableness or lawfulness of an order determined. This court has jurisdiction to review the commission's order, including the legal basis thereof, on any complaint which the commission has jurisdiction to entertain and hear in the first instance. (*Commerce Com.* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 309 Ill. 165; *Grossman* v. *Industrial Com.* 376 id. 198; *Lowden* v. *Commerce Com.* id. 225.) The position of appellees in this respect is wholly without merit.

Counsel for appellants and for the numerous *amici curiae* have made many other suggestions which they contend support the claims of appellee. Among the recent statutes to which our attention has been directed are the Local Transportation act of 1935, (Ill. Rev. Stat. 1939, chap. 24, par. 207a,) the Terminable Permit act of 1929, (Ill. Rev. Stat. 1939, chap. 131¼, pars. 17, 18,) and the Transit Commission act of 1929. (Ill. Rev. Stat. 1939, chap. 111⅔, par. 90a.) It would unnecessarily prolong this decision to discuss in detail, all of the statutes mentioned. We have examined each of them with care, and do not find anything in any of them which changes or modifies the general structure of the Public Utilities act except in so far as the Local Transportation act and the Transit Commission act take from the Commerce Commission jurisdiction to supervise transportation under the particular conditions specified in such acts. The Terminal Permit act simply provides cities may grant franchises to a transportation system, of indefinite duration, in cities with a population of 500,000 or more, reserving certain rights to purchase upon terms fixed in the ordinance. The objectives to be accomplished by these statutes have no bearing upon the question whether the Commerce Commission has been given power to control the occupancy of the

streets of a city, nor do they throw any light upon the question whether the rights of the city to such control and occupancy have been repealed by implication.

The numerous counsel for *amici curiae,* as well as attorneys for appellee, point out to us the great public interests involved, and suggest that many utilities will be affected by the construction we place upon the Public Utilities act in this opinion. Public utilities were in operation under franchises of fixed duration long before the adoption of the Public Utilities act. Many of these are still so operating. We have no doubt but that the able lawyers whose names appear upon the briefs of appellees and *amici curiae* in this case were well aware that the particular question involved in this case had never been directly decided by this court, and that utilities have been financed notwithstanding this point was unsettled. Giving full weight to appellee's claim of the extent the construction herein will affect public utilities, it is equally true the opposite construction will have as great, if not greater, effect upon the administration of corporate powers by cities and other municipalities.

It is not for us to judge the propriety of legislation, but to construe the laws when enacted. The legislature has not seen fit to say, in express language, or by the enactment of directly conflicting provisions, that the control of the occupancy of the streets of a city has been transferred to the Illinois Commerce Commission, and, as we construe the law, they never did intend so to do.

The judgments of the circuit courts of McLean and Henry counties are reversed and the causes remanded with directions to remand the several cases to the Illinois Commerce Commission to enter orders in each case in accordance with the views herein expressed.

*Reversed and remanded, with directions.*

Mr. JUSTICE STONE, dissenting:

I cannot concur in the entry of the judgment directed by the majority opinion. The controlling question in these

cases is, and always has been, one of construction of applicable statutes in accord with legislative intent. The whole field of public utilities and their relation to cities and villages is admittedly a legislative matter. Legislation has been enacted in that field.

Cities and villages on the one hand, and the Commerce Commission on the other, are creatures of the General Assembly. Each possesses such powers, and only such powers, as are conferred upon it by legislative enactment. Cities and villages and their powers are wholly under the control of the General Assembly. (*People* v. *City of Springfield*, 370 Ill. 541; *Normal School* v. *City of Charleston*, 271 id. 602; *Metropolitan Elevated Railway Co.* v. *City of Chicago*, 261 id. 624.) The Commerce Commission likewise derives its powers only from the statute. It has no authority except such as is thereby expressly conferred upon it. *Lambdin* v. *Commerce Com.* 352 Ill. 104; *Chicago Railways Co.* v. *Commerce Com.* 336 id. 51; *Public Utilities Com.* v. *Illinois Central Railroad Co.* 274 id. 36.

It is settled in this State that the General Assembly may transfer powers previously conferred on cities and villages to the Commerce Commission and take such powers from it and reconfer them upon cities and villages. (*Chicago, North Shore and Milwaukee Railroad Co.* v. *City of Chicago,* 331 Ill. 360; *Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 id. 425.) It follows, therefore, that courts, though called upon to determine legislative intent as expressed in statutes dealing with the subject, may not interfere with such legislation so long as it is within constitutional limitations.

In *Chicago Motor Coach Co.* v. *City of Chicago,* 337 Ill. 200, and *City of Geneseo* v. *Illinois Northern Utilities Co.* 363 Ill. 89, I dissented from the construction placed by the majority opinions upon the statutes involved, on the ground that such construction did not accord with legislative intent. Since the decision in the *Motor Coach case,*

six General Assemblies have sat, and since the *Geneseo case,* three. No amendment to the Public Utilities act indicating legislative intent to change the results of those cases has been enacted, though attempts to secure such changes have been made. It has long been a settled and unvaried rule in this State, that where a decision of this court has been recognized by the General Assembly and has been acted upon for a substantial period of time, it is the province of the General Assembly, and not of this court, to change the effect of that decision if the people want it changed. (*Headen* v. *Rust,* 39 Ill. 186; *Bulpit* v. *Matthews,* 145 id. 345.) This rule should apply with particular force to decisions construing legislative intent. I am, therefore, convinced that this court should not, at this late day, change the long adopted interpretation of these statutes.

That this is so finds further important support in the fact, which this court is entitled to know because generally known, though not shown by these records to have been true of either of appellees, that numerous like utilities in this State have been financed, or refinanced, on the basis of a certificate of convenience and necessity from the Commerce Commission, and bonds have been issued and sold on such basis. Doubtless in some of such cases franchises issued by cities or villages have expired. To now hold that the continued existence of such utilities must depend upon the uncertainty and limited period of a city or village franchise, is to subject the investment of the purchasers of such bonds to a drastic shrinkage in value. Such a result should certainly be avoided.

For these reasons, and because of the importance of stability in judicial decision, I am of the opinion that the orders of the trial courts in these cases should be affirmed.

Mr. JUSTICE SHAW, also dissenting.