FORD MOTOR CREDIT COMPANY, INC., Plaintiff and Counter-defendant,

v.

AARON LINCOLN–MERCURY, INC., Elliott Dulberger, and Arthur Nelson, Defendants, Counter-Plaintiffs and Third Party Plaintiffs,

v.

FORD MOTOR COMPANY, Third Party Defendant.

No. 82 C 5350.

United States District Court, N.D. Illinois, E.D.

June 8, 1983.

See also D.C., 563 F.Supp. 1108.

Thomas B. McNeill, Michael R. Feagley, John T. Hundley, Mayer, Brown & Platt, Chicago, Ill., for Ford Motor Co.

Arnold I. Kramer, Chicago, Ill., for Aaron Lincoln-Mercury, Elliott Dulberger and Arthur I. Nelson.

MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Currently before the court is Ford Motor Company's ("Ford") motion to dismiss the claims against it of Aaron Lincoln-Mercury ("Aaron"), Elliott Dulberger ("Dulberger"), and Arthur Nelson ("Nelson") (collectively, "plaintiffs") under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. These claims were made in a third party complaint filed in an action

then proceeding in the Circuit Court of McHenry County, Illinois between Ford Motor Credit ·Company ("FMC") and Aaron, Dulberger and Nelson. Ford removed the entire action to this court. On April 29, 1983, we remanded to the state court FMC's claim against Aaron et al. and their counterclaim against FMC. *See Ford Motor Credit Company, Inc. v. Aaron Lincoln-Mercury, Inc.,* 563 F.Supp. 1108 (N.D.Ill.1983). Remaining in this court are plaintiffs' claims against Ford, which formed counts 1 and 3 of the third party complaint. These claims are the subject of this motion.

█ Count 1 purports to state a claim of misrepresentation. There is some dispute over whether it is pleaded as a claim of intentional misrepresentation or negligent misrepresentation, but we need not address that issue. Plaintiffs claim in count 1 that in soliciting Dulberger to become a Lincoln-Mercury dealer in McHenry, Illinois, Ford furnished him with a "Sales and Profit Forecast" for the dealership. *See* Third Party Complaint, Ex.C. This forecast, which purported to be based on data from the entity then running the dealership, is claimed to be untrue and misleading. It is alleged that Aaron's predecessor was somewhat profitable in 1978 but that in 1979 it suffered great losses. The Sales and Profit Forecast was prepared in August 1979. It lists "historical data" from the predecessor relating to its sales and performance and then makes a "forecast" of future performance. Plaintiffs allege that Ford left the unfavorable January—August 1979 data out of the historical data section. Ford agrees that it did so. Although the complaint is unclear, in their response to the motion to dismiss plaintiffs assert that they complain not of the omission of the 1979 data in and of itself but rather of an alleged mischaracterization of the 1978 data as 1979 data. *See* Answer to Third Party Defendant Ford Motor Company's Motion to Dismiss at 3.

The claim of misrepresentation hinges on the following notation at the top of the "historical data" column:

## HISTORICAL DATA

### 1978 DEC. YTD [1]

The parties agree that "YTD" means "year to date." Plaintiffs allege that they understood the notation to mean that the historical data was based on the time period from December 1978 through the date the Forecast was prepared. Defendant maintains that the notation clearly refers to data covering the entire calendar year 1978 and therefore is not misleading. We think that another reference to a similar notation in the Forecast makes plaintiffs' reading untenable. At the bottom of the first page of the Forecast, the following sentence appears (the underlined words are handwritten; the rest is printed on the form):

> Forecast figures are based on the estimated sales potential of the dealer point and the experience of the *other Sat. [illegible]* Dealer Group in the *Chicago District* [sic] District through *Dec. 78 YTD.*

This reference makes it clear that when defendant's agent prepared the form, he or she used the "YTD" notation in connection with "Dec. 78" and "1978 Dec." to indicate that the listed data was not just from the month of December 1978 but rather was for the entire year 1978, through December of that year. Plaintiffs' reading makes no sense, particularly when one looks at the other reference to the "YTD" notation on the form. Ford did not represent that· the historical data was 1979 data; rather, it identified it accurately as 1978 data. That being the case, there was no misrepresentation in the sense alleged by plaintiffs. Count 1 is dismissed for failure to state a claim.

Count 3 [2] is based on alleged violations of the Illinois Franchise Disclosure Act, Ill. Rev.Stat. ch. 121½, §§ 701–40 (1981) ("IFDA"). The IFDA, enacted in 1974, requires that sellers of franchises make detailed disclosures to prospective franchisees, *see id.* §§ 702, 705; prohibits discrimination

---

1. The figures "19" are printed on the form. The rest—"78 DEC. YTD"—was written in.

2. Count 2 requested relief only against FMC and thus is no longer before us.

among franchisees, *id.* § 704.2; prohibits termination without good cause, *id.* § 704.3; and bans fraudulent practices in connection with the offer or sale of any franchise, *id.* §§ 706, 708, 709. It also provides that any franchisee damaged due to a violation of the IFDA may bring a civil action for damages based upon the violation. *Id.* § 721(1).

Here plaintiffs allege that Ford violated the statute's disclosure requirements in two respects.[3] They claim that Ford failed to furnish Aaron with a copy of a statement of projected sales or earnings together with a statement setting forth the data on which the projections were based. They also assert that Ford did not provide Aaron with a copy of all proposed agreements relating to the sale of the franchise at least seven days before the sale. No challenge is made to the sufficiency of plaintiffs' allegations of improper disclosure. Rather, Ford argues solely that the provisions of the IFDA do not apply to automobile dealerships.

Ford argues first that the legislature did not intend the IFDA to reach automobile dealerships. It recognizes that no such indication appears in the language of the statute itself. It argues, however, that automobile dealerships are not "franchises" of the type that the legislature sought to regulate when it enacted the IFDA. It asserts that the legislature did not intend to regulate "product distribution franchises," a category in which automobile dealerships are claimed to fall, but rather only "busi-

ness format franchises." *See generally* Rudnick & Ginsburg, *The Illinois Franchise Disclosure Act,* 62 Ill.B.J. 256, 258–60 (1974). It appears that one of the salient differences between the two types of franchises is that "business format" franchises require the payment of an initial franchise fee and continuing royalty payments, while "product distribution" franchises do not. *See id.* Indeed, the IFDA defines "franchise" as an agreement by which the franchisee granted the right to engage in a business "is required to pay, directly or indirectly, a franchise fee of $100 or more." Ill.Rev.Stat. ch. 121½, § 703(1)(c) (1981).[4] However, the statute specifically contemplates that agreements which grant a franchisee the right to engage in the business of selling goods are subject to the IFDA, assuming the other requirements of the definition of "franchise" are met. *See id.* § 703(1)(a).

In any event, Ford focuses on the franchise fee requirement. It argues that since automobile dealerships carry no franchise fee, they must not have been intended to be subject to the IFDA. While it is clearly true that automobile dealerships which require no franchise fee are not subject to the statute, we find nothing in the IFDA itself exempting dealerships for which a fee, as defined in the statute, is paid. And while it may be true, as a general matter, that automobile dealerships do not carry a fran-

---

3. Plaintiffs also assert in count 3 that FMC failed to give them certain information it was required by the IFDA to provide. We understand this part of count 3 to seek relief solely against FMC and therefore to present a claim no longer before this court. In any event, Ford does not challenge the sufficiency of that particular allegation.

4. "Franchise fee" is defined as follows:
   "Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay directly or indirectly for the right to enter into a business or sell, resell, or distribute goods, services or franchises under an agreement, including, but not limited to, any such payment for goods or services, provided that the Administrator may by rule define what constitutes an indirect franchise fee, and provided further that the following shall not be considered the pay-

ment of a franchise fee: (a) the payment of a reasonable service charge to the issuer of a credit card by an establishment accepting or honoring such credit card; (b) amounts paid to a trading stamp company by a person issuing trading stamps in connection with the retail sale of merchandise or services; (c) the purchase or agreement to purchase goods for which there is an established market at a bona fide wholesale price; or (d) the purchase or agreement to purchase goods for which there is an established market at a bona fide retail price subject to a bona fide commission or compensation plan. The Administrator may by rule define what shall constitute an established market.
Ill.Rev.Stat. ch. 121½, § 703(14) (1981). We need not decide at this juncture whether the granting of this dealership met this definition.

chise fee, there is no evidence now before us that no such fee was required or paid in connection with the granting of *this* dealership. In other words, the clear language of the statute provides that any offering or sale of a "franchise," as defined in the IFDA, is subject to the statute's provisions. The complaint here alleges that this dealership meets the statutory definition. While Ford may well be able to show, on a motion for summary judgment, that this dealership is not a "franchise" within § 703(1), that motion has not yet been made.

Ford next argues that because the legislature, some five years after enacting the IFDA, enacted a statute specifically covering automobile dealerships, even if such dealerships were covered by the IFDA the later statute by implication eliminated that coverage. As was true with Ford's first argument against IFDA coverage, there are no Illinois cases directly addressing the point.

The Illinois Motor Vehicle Franchise Act, Ill.Rev.Stat. ch. 121½, §§ 751–64 (1981) ("IMVFA"), was enacted in 1979. Its primary effect is to declare unlawful certain enumerated "unfair methods of competition and unfair and deceptive acts or practices." Among these acts and practices are: acting in bad faith vis-a-vis a dealer; coercing a dealer to order unwanted products; refusing to supply reasonable quantities of products; threatening to reduce a dealer's allocation of motor vehicles; termination without notice and good cause; price discrimination among dealers; misleading advertising; unreasonable interference with a dealer's attempt to change its management or capital structure; and the like. *See id.* § 754. Significantly, no attempt is made to regulate disclosures made in connection with the solicitation of prospective franchisees.

■ Ford argues that the existence of a statute applying specifically to automobile dealerships supersedes the more generally applicable IFDA as far as automobile dealerships are concerned. We think that Ford states this principle too broadly. The actual rule of Illinois law [5] was set forth by the Illinois Supreme Court in *Chicago Park District v. Harris,* 402 Ill. 214, 83 N.E.2d 702 (1949):

> A general statute applies to all within its general purview upon the subject matter, unless a special statute exists to give particularity to the general subject, or creates a different law for a particular locality. A special law, where it applies to a special territory or territories in a different manner, or is a complete act within itself, operates to repeal pro tanto the general law *to the extent of conflicting with it,* or supersedes or constitutes an exception to the general law *where there is a conflict between it and the special enactment.*

*Id.* at 222, 83 N.E.2d at 705 (emphasis supplied). *See also Lake County v. Cuneo,* 333 Ill.App. 164, 76 N.E.2d 826 (1947):

> A later particular statute relating only to one subject repeals an earlier general law *to the extent of any irreconcilable conflict between their provisions,* or in other words, engrafts on the general statute an exception *to the extent of the inconsistency. . . . To the extent they are in conflict the first act is repealed, but the parts of the first act not affected remain in force and effect.*

*Id.* at 171–72, 76 N.E.2d at 829 (emphasis supplied). *Accord, City of Geneseo v. Illinois Northern Utilities Co.,* 378 Ill. 506, 529–30, 39 N.E.2d 26, 37–38 (1941).

■ Applying this principle, it is clear that certain provisions of the IMVFA conflict with parallel provisions of the IFDA and therefore that the pertinent provisions of the latter do not apply to automobile dealerships. *Compare, e.g.,* Ill.Rev.Stat. ch. 121½, § 722 (1981) *with id.* § 764 (statute of limitations for civil actions challenging

---

**5.** Because we have jurisdiction over this case by reason of diversity of citizenship, *see* 28 U.S.C. § 1332(a) (1976), under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must look to state law to decide defendant's motion.

improper terminations); *id.* § 704.4 *with id* § 759 (governing nonrenewal of franchises); *id.* § 721(2) with *id.* § 763 (governing equitable relief in private civil actions). However, nothing in the IMVFA purports to govern pre-sale disclosures, nor is there anything in the language of the statute that indicates that that aspect of the IFDA is no longer to apply to franchises otherwise within the IFDA's scope. Therefore, there is no basis here for a "repeal by implication" of the IFDA's disclosure requirements as applied to automobile dealerships.[6]

In conclusion, the motion to dismiss for failure to state a claim is granted as to count 1 but is denied as to count 3. Discovery was initially set to be terminated as of April 4, 1983. That date, as requested by Ford, is hereby extended to July 8, 1983. Final pretrial materials August 15, 1983; final pre-trial conference September 7, 1983 at 4:30 p.m. Trial date of September 12, 1983 to stand.

---

**6.** Ford points to Ill.Rev.Stat. ch. 121½, § 758 (1981), which provides that the IMVFA applies to *all* motor vehicle franchise agreements, including the franchise offering. It is quite a leap from that provision to the conclusion Ford draws, which is that § 758 evinces a legislative intent to make the IMVFA the sole statute governing motor vehicle dealerships. We decline to take that leap.

Ford also argues that the enactment of the IMVFA itself indicates that the legislature did not understand the earlier IFDA to apply to motor vehicle dealerships. It argues that the addition of the new legislative provision is an indication of the absence of prior coverage, citing *Western National Bank v. Village of Kildeer,* 19 Ill.2d 342, 354, 167 N.E.2d 169, 175 (1960). However, in *Western National Bank* the legislature had amended the statute in question so as to expand its coverage; thus, it was clear that it meant that the statute as previously written did not have the broader scope. In the present case all that was done was to enact a new statute applying different requirements and prohibitions to a certain type of contractual franchise arrangement. Without evidence that automobile dealerships *never* require "franchise fees" as defined in the IFDA and therefore cannot be within the scope of that statute, evidence not now before us, the most we may draw from the enactment of the IMVFA is that the legislature was persuaded not that motor vehicle franchises were as yet unregulated but rather that circumstances indicated that different requirements should apply to such franchises.