COLES-MOULTRIE ELECTRIC COOPERATIVE, Plaintiff-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees.

Fourth District   No. 4—84—0412

Opinion filed March 29, 1985.—Modified on denial of rehearing May 3, 1985.

Jon W. DeMoss, of Springfield, and William A. Sunderman, of Brainard, Bower & Kramer, of Charleston, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos, Special Assistant Attorney General, and Steven G. Revethis and John P. Kelliher, Assistant Attorneys General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

William S. Hanley, of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellee Central Illinois Public Service Company.

JUSTICE TRAPP delivered the opinion of the court:

The plaintiff, Coles-Moultrie Cooperative (CM), appeals a circuit court order affirming a decision of the Illinois Commerce Commission (Commission) that CM and defendant Central Illinois Public Service Company (CIPS) have an equal right to provide electric service to customers residing within a particular area.

The area as to which the parties dispute the right to furnish electricity is located immediately north of Illinois Route 133 and east of Interstate Highway 57, and is known as "Industrial Estates." The first electrical service on this tract of land apparently commenced in September 1968, when CIPS began providing service to a concrete mixing plant located there, which provided concrete for the construction of Interstate 57. The next electrical service in the area began on March 3, 1969, when CM began providing power for use in the construction of a building for G&S Services (G&S). Prior to CM's commencing this service, G&S applied to CIPS for electrical service, but was referred to CM.

On March 17, 1969, the city of Arcola annexed the Industrial Estates area. Prior to annexation, CIPS had apparently ceased providing service to the concrete mixing plant. Shortly after annexation, a dispute developed between CM and CIPS as to which of them was entitled to permanently serve the G&S premises. In 1970, the Commission resolved this dispute in favor of CM, holding that it has the exclusive right to serve G&S.

Between April 1970 and March 1983, CIPS connected eight commercial electricity customers in the Industrial Estates area, and CM

connected one additional commercial customer as well as some mobile homes in that area.

The events which form the basis for the present dispute began in 1980 when the Sukup Manufacturing Company began construction of a building in Industrial Estates. During construction of the Sukup building, CM provided temporary service to the premises by means of a circuit from the G&S building. On April 30, 1981, pursuant to section 7 of the Electric Supplier Act (ESA) (Ill. Rev. Stat. 1983, ch. 111²⁄₃, par. 407), CM provided CIPS with a notice of its intent to construct a permanent distribution line to serve Sukup. On the same day, CIPS wrote Sukup, describing the method by which it proposed to serve its premises. On the following day, a Sukup representative submitted a written request for electric service to CIPS, and CIPS commenced installation of facilities to provide that service on the same day.

On May 5, 1981, CM obtained an *ex parte* injunction prohibiting CIPS from serving Sukup, but this injunction was dissolved seven days later. On May 15, 1981, CIPS completed installation of facilities to serve Sukup, and has provided electricity to the Sukup premises since that date.

CIPS is the holder of a 75-year franchise, granted October 1, 1945, entitling it to "construct, maintain and operate within [Arcola's] corporate limits as the same exists or may hereafter be extended *** an electric light, heat and power system ***." Also, CM is entitled to provide electricity to limited areas of Arcola, pursuant to a 25-year franchise granted June 3, 1969. The areas of Arcola to which CM may serve are described as follows:

> "[A]ll areas, tracts and premises heretofore annexed to the City of Arcola, in which area, tract or premise there are existing lines of Coles-Moultrie Electric Cooperative on the effective date of this ordinance. The rights granted herein shall furthermore extend to all areas, tracts and premises hereafter annexed to said City in which: (1) Coles-Moultrie Electric Cooperative has an existing line or lines at the time of such annexation; or, (b) Coles-Moultrie Electric Cooperative would be entitled to serve by virtue of the provisions of the Electric Supplier Act, as enacted by the 74th General Assembly of the State of Illinois, and approved on July 2, 1965, if such territory had not been annexed; or, (c) no electric service is being rendered by any supplier of electric energy at the time of such annexation."

On May 20, 1981, CIPS filed a complaint with the Commission,

requesting: (1) that CM be ordered to cease and desist from representing to customers other than G&S that it has the exclusive right to extend its lines to provide electricity to customers within the corporate limits of any incorporated municipality in which CIPS had a valid franchise as of the ESA's effective date; and (2) that the Commission declare the parties' rights pursuant to the ESA, the Commission's order finding that CM is exclusively entitled to serve G&S and the franchises granted by Arcola, and in connection therewith find that (a) with respect to the Industrial Estates area, either CM or CIPS may provide electricity to any customer in the area, provided that the supplier has permission from the city to provide such service, (b) that for the duration of its franchise, CIPS "has the right to extend its lines for providing electric service within the territorial limits of the municipality of Arcola as they may be extended from time to time" without further necessity for Commission approval, and (c) "that for purposes of this Complaint being a timely response to" CM's notice of intent to serve Sukup, the Commission find that it lacks jurisdiction under the ESA to determine which of the parties is exclusively entitled to serve the Sukup premises. In its answer, filed June 8, 1981, CM denied the salient allegations of CIPS' complaint and requested a finding that CM, and not CIPS, is entitled to serve the Sukup premises.

In a decision filed March 22, 1983, the Commission held that both CM and CIPS are entitled to serve customers (other than those on the G&S premises) located in the Industrial Estates area; that CM had ample foundation for sending CIPS a notice of intent to serve Sukup (thus rejecting CIPS' jurisdictional argument); and that CM's conduct in informing Sukup that it had an alleged exclusive right to serve its premises did not warrant corrective action.

On April 22, 1983, CIPS filed a complaint in administrative review, requesting reversal of the Commission's decision on the basis that the findings that CM had ample foundation for sending CIPS its notice of intent to serve Sukup and that CM's conduct did not warrant corrective action were against the manifest weight of the evidence, and on the basis that the Commission's order failed to make any findings of facts or conclusions of law as to the propriety of CM's obtaining a preliminary injunction in an *ex parte* proceeding. (The complaint which CIPS filed with the Commission requested no specific relief as to the latter matter.) On April 28, 1983, CM filed a motion to dismiss CIPS' complaint, and also filed a countercomplaint requesting reversal of the Commission's decision on grounds, *inter alia*, that CM is exclusively entitled to serve Sukup, that the Commission's allowing CIPS to serve Sukup resulted in wasteful duplication of CM's existing

lines, and that the Commission's decision, contrary to the intent of the ESA, gives electricity customers in the Industrial Estates the right to change suppliers whenever they wish.

On December 5, 1983, the circuit court dismissed with prejudice CIPS' complaint for administrative review and realigned the parties in that CM became the plaintiff and CIPS the defendant in administrative review. The circuit court affirmed the Commission's decision on May 8, 1984.

Reduced to their most elemental terms, the positions of the parties to this appeal are relatively straightforward—CIPS and the Commission contend that both CIPS and CM are entitled to serve the Industrial Estates area (with the exception of the G&S premises) and that electricity customers (other than those on the G&S premises) located in that area may decide for themselves by which of the two suppliers they wish to be served. CM, on the other hand, asserts that by virtue of its serving G&S when the Industrial Estates area was annexed to Arcola, it is exclusively entitled to serve all electricity customers residing in the area.

▪️ A brief overview of the regulatory scheme applicable to electricity suppliers is essential to an understanding of the issues involved in the case at bar. Illinois municipalities have long had discretion to grant (or to refuse to grant) franchises to electricity suppliers. This power derives from the right of municipalities to control and regulate the use of their streets. (*City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26, *cert. denied sub nom. Illinois Northern Utilities Co. v. City of Geneseo* (1942), 316 U.S. 670, 86 L. Ed. 1746, 62 S. Ct. 1046.) The *City of Geneseo* decision has been interpreted as establishing that the power of municipalities to regulate the use of their streets is paramount to the power of the Commission to regulate public utilities. Note, *Municipal Corporations—Licensing Public Utilities For Use of Streets*, 1950 U. Ill. L. F. 295.

Section 55 of "An Act concerning public utilities" (Ill. Rev. Stat. 1983, ch. 111²⁄₃, par. 56) provides that a public utility must obtain from the Commission a certificate of convenience and necessity before constructing a new plant, new equipment, etc., which is not in substitution of any such existing facilities or "in extension thereof or in addition thereto," except "with respect to any matter as to which [a public utility] has received the authorization or order of the Commission under the Electric Suppliers Act." The rates of public utilities are also subject to regulation by the Commission. Ill. Rev. Stat. 1983, ch. 111²⁄₃, par. 36.

Electric cooperatives are not "public utilities" as defined in "An

Act concerning public utilities" and thus are not subject to regulation by the Commission (Ill. Rev. Stat. 1983, ch. 111⅔, par. 10.3), except to the extent set forth in the ESA (Ill. Rev. Stat. 1983, ch. 111⅔, pars. 401 to 416). Furthermore, cooperatives are not entitled to be heard or otherwise appear in Commission proceedings regarding authorization for power plant construction or matters as to which a remedy is available under the ESA. Ill. Rev. Stat. 1983, ch. 111⅔, par. 56.

The ESA, which became effective July 2, 1965, encourages electricity suppliers to provide for the delineation of areas of service by mean of contracts between competing suppliers specifying areas of service (Ill. Rev. Stat. 1983, ch. 111⅔, pars. 402, 406), and generally requires that electricity suppliers whose lines are in close proximity to those of other suppliers provide the Commission with maps of their lines. (Ill. Rev. Stat. 1983, ch. 111⅔, par. 404.) The ESA further provides that electricity suppliers may continue serving premises which they were serving, had contracted to serve, or as to which they had discontinued service within 12 months of the ESA's effective date if service facilities were still located on the premises at that time. No supplier may construct new or extend existing lines to serve a premises which another supplier is entitled to serve without the written consent of the other supplier "subject to the approval of the Commission as to such consent, if required." Ill. Rev. Stat. 1983, ch. 111⅔, par. 405.

Also, a supplier may not generally construct new or extend existing lines unless it gives written notice to any other supplier or suppliers who would be adversely affected by such action. The most significant exceptions to this requirement are (1) those delineated in section 5 of the ESA (Ill. Rev. Stat. 1983, ch. 111⅔, par. 405), such as where there was existing service or a contract to provide service on the ESA's effective date or where there were on the ESA's effective date electricity supply facilities on a premises as to which service had been discontinued within 12 months of that date; (2) situations in which a supplier wishes, for the purpose of furnishing a customer with service, to extend a line with voltage capacity of 600 or less for a distance of 300 feet or less, provided that the extension "does not make the service of that supplier any nearer to the existing lines of another supplier than at the effective date of this Act;" and (3) in the case of public utilities, situations where there are no lines of an electric cooperative in the county or in a county adjacent to the county where the line extension is to be made or where the extension will be located more than five miles away from an existing line of an electric cooper-

ative. (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 407.) If a supplier files a complaint with the Commission after having received a notice of intent to serve from a competing supplier, the Commission must hear the parties' positions and then make a determination as to which is entitled to furnish the proposed service. Ill. Rev. Stat. 1983, ch. 111²/₃, par. 408.

A separate provision of the ESA (section 14) (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 414) applies to electricity supplier line extensions within municipalities. This section states that except for the provisions which allow suppliers to continue serving premises which they had been serving or had agreed to serve on the ESA's effective date and to resume service to premises as to which they had discontinued service within 12 months of the ESA's effective date but still had equipment located on the premises as of that date, the ESA provisions as to the necessity of obtaining written permission to serve premises which other utilities are entitled to serve and as to providing notices of intent to serve to utilities which would be adversely affected by proposed line extensions are inapplicable to areas included in municipalities. Moreover, a supplier which is serving in an area annexed to or which is "otherwise located within an incorporated municipality" may continue to furnish service to premises in that area which it was serving at the time of the incorporation or annexation, subject to three provisions as to line extensions within the municipality, which are unimportant in view of our disposition of this matter.

Section 14 of the ESA further provides that an electricity supplier needs no permission to extend its lines within a municipality to the extent that on the ESA's effective date it had permission from either the municipality or the Commission or "as a matter of law" to so extend its lines, "but any such authorization must [have been] lawfully in effect" on the ESA's effective date.

■ The first question which we consider is the effect on the dispute before us of the last-mentioned portion of section 14 of the ESA. At the outset, it should be recalled that the franchise granted CIPS by Arcola provides that it is applicable to the entire corporate limits of the city, "as the same now exists or may hereafter be extended."

CIPS and the Commission contend that the language of section 14 of the ESA, and of CIPS' franchise, quoted immediately above, exempts CIPS from obtaining any further permission for line extensions within the corporate limits of Arcola. CM asserts that the statutory language on which CIPS and the Commission rely is inapplicable because on the ESA's effective date CIPS was not authorized to serve the Industrial Estates. CM's premise for this assertion is that a fran-

chise purporting to grant a public utility the right to serve areas not yet a part of the city would have constituted an illegal attempt to enact an ordinance having extraterritorial effect.

We deem the view of CIPS and the Commission to represent the better position. It is true, as CM points out, that a municipal ordinance can have no extraterritorial effect. (*E.g., Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 432 N.E.2d 227; *Dean Milk Co. v. City of Aurora* (1949), 404 Ill. 331, 88 N.E.2d 827; *City of Rockford v. Hey* (1937), 366 Ill. 526, 9 N.E.2d 317.) However, virtually all of the cases which so hold involved an attempt to give *present* effect to an ordinance in an area *not at that time* a part of the municipality which sought to enforce the ordinance. In the instant case, by contrast, the parties make no contention that the franchise ordinance was effective in the Industrial Estates area prior to its annexation by Arcola, and the ordinance could not have had such effect. Rather, the ordinance became applicable to Industrial Estates only when Arcola annexed that area. Upon annexation, no further legislative action was necessary in order for the ordinance to be applied to the Industrial Estates, for when a municipality annexes new territory, its ordinances automatically become applicable to the annexed area. *People ex rel. City of Chicago v. Chicago Telephone Co.* (1906), 220 Ill. 238, 77 N.E. 245; *City of Highland Park v. Calder* (1932), 269 Ill. App. 255.

■ CM further contends that the last phrase of the portion of section 14 of the ESA on which CIPS and the Commission rely, providing that authorization to extend lines "must have been lawfully in effect [at the time of the ESA's enactment]," requires a holding that CIPS was not, at the ESA's effective date, authorized to extend its lines into areas subsequently annexed to Arcola. In our view, however, this language relates only to situations where there was no franchise whatsoever validly in effect on the ESA's effective date, such as where an agreement in principal as to a franchise had been reached, but the franchise had not yet been executed.

■ CM also places reliance on section 11−117−1 of the Illinois Municipal Code (Ill. Rev. Stat. 1983, ch. 24, par. 11−117−1), which requires Commission approval prior to a municipality's acquiring by eminent domain property outside of its boundaries for use in the production of electricity. CM asserts that this provision is indicative of a legislative intent that municipalities exercise no extraterritorial control over electrical systems. However, as previously indicated, the franchise at issue here involves no exercise of extraterritorial authority; rather it provides for the exercise of franchise rights only as to territory included within municipal limits at either the time of its en-

actment or at future dates.

■■ Also, in support of its argument that CIPS does not have unbridled discretion to extend its lines within Arcola's city limits, CIPS cites section 2.1 of the ESA:

> "It is declared to be the public policy of this State, pursuant to paragraphs (h) and (i) of Section 6 of Article VII of the 1970 Illinois Constitution, that, except as otherwise provided in this Act, any power or function set forth in this Act to be exercised by the State is an exclusive power or function and such power or function may not be exercised concurrently, either directly or indirectly, by any unit of local government." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 402.1.)

In our opinion, this provision makes it clear that those matters committed to the Commission's discretion by the ESA are matters for the Commission and not municipalities to determine. However, the second paragraph of section 14 of the ESA clearly removes the extension of electric lines pursuant to franchises in existence on the ESA's effective date from the control of the Commission and vests sole authority as to such extensions in municipalities.

In sum, on the ESA's effective date, CIPS possessed authorization to extend its lines as Arcola's boundaries expanded. That authority does not run afoul of the prohibition against extraterritorial ordinances, because CIPS may extend its lines into areas not within Arcola on the ESA's effective date only upon the actual annexation of new territory to the city. A contrary result would have the absurd consequence of requiring the granting of new utility franchises every time the smallest piece of territory is annexed to a municipality. Such could not have been the legislative intent.

CM also contends that the first part of the second sentence of the first paragraph of section 14 gives it the exclusive right to serve the Industrial Estates:

> "An electric supplier which is serving in an area which has been or hereafter becomes annexed to or otherwise located within an incorporated municipality may continue to furnish service within such annexed or otherwise incorporated area to the premises which it is serving at the time of such annexation or incorporation ***." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 414.)

The gravamen of this portion of CM's argument is that since Nell Van Voorhis Smith owned the entire tract which later became known as Industrial Estates at the time that service to G&S began, the entire tract constituted a single premises which CM was serving at the time

of its annexation to Arcola. Therefore, CM argues that it has an exclusive right to serve the entire tract and all present and future and customers thereon pursuant to the above-quoted language contained in section 14.

For purposes of the ESA, "premises" is defined as:

> "[A] physical area (a) which, except for any intervening public or private rights of way or easements, constitutes a single parcel or unit and (b) which a single customer owns, uses or in which it has some other interest in connection with receiving service at one or more points of delivery." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 403.12.)

"Customer" means:

> "[A]ny person receiving electricity for any purpose from an electric supplier." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 403.3.)

Finally, a "person" is:

> "[A]n individual, corporation, partnership, electric cooperative, public utility, association, joint stock company, trust, incorporated municipality, municipal corporation, and any governmental entity or political subdivision thereof." Ill. Rev. Stat. 1983, ch. 111²/₃, par. 403.11.

An analysis of the language of the provisions defining premises and customer for ESA purposes, juxtaposed with the evidence presented to the Commission, belies CM's contention that it possesses an exclusive right to serve Industrial Estates. A premises is defined as, *inter alia*, a single parcel or unit which a single customer uses. A customer may be an individual, corporation or sole proprietorship. Obviously there can be only one customer on a particular parcel or unit of land, and that customer is the business entity, governmental entity or natural person or group of natural persons having the predominate interest in obtaining electrical service on the premises. If the customer is a group of natural persons, such as a family, each group member must have a co-equal interest in obtaining electrical service at that location, and the group may not constitute an organization of a type which has traditionally been regarded as a business entity, such as a partnership.

In the present case, the evidence does not clearly establish whether G&S was a corporation or an unincorporated partnership at the time that CM first began providing it with electricity. It is also unclear whether Ms. Smith had an interest in G&S at that time and what, if anything, the extent of her interest was. What organizational structure G&S possessed at the time it began receiving electricity from CM and what, if any, interest Ms. Smith owned therein is, how-

ever, unimportant for our purposes here. What is important is that G&S was operating at that time as a separate business entity, was at least in part owned by persons other than Ms. Smith, and an identifiable portion of the tract was set apart for G&S's use. As the occupant of the premises at which CM began providing service, G&S, as a business entity, had an interest superior to that of any of its owners in obtaining electrical service at that site. Since G&S, and not Ms. Smith, was thus the customer to which CM began providing service in March 1969, and G&S did not at that time own the Industrial Estates area in its entirety, the Commission correctly held that CM's exclusive service rights under the second sentence of the first paragraph of section 14 are limited to the G&S premises.

Both parties also raise numerous contentions as to the relevance and applicability of the portions of the first paragraph of section 14 describing situations in which the Commission and/or municipal approval is required for electricity supplier line extensions within municipalities. Because of our decision, we need not address these arguments.

CM further asserts that a decision that both it and CIPS are entitled to compete for customers within Industrial Estates would run counter to a public policy clearly enunciated by the legislature and the courts, that duplication of facilities on the part of electricity suppliers is to be avoided. In support of this contention, CM points out that its lines almost surround the Sukup premises, and that CIPS was able to serve Sukup only by constructing a much longer line than CM would have had to construct in order to serve that establishment.

In the two cases on which CM relies in support of this assertion (*Illinois Power Co. v. Illinois Commerce Com.* (1968), 39 Ill. 2d 406, 235 N.E.2d 614; *Coles-Moultrie Electric Cooperative v. Illinois Commerce Com.* (1979), 76 Ill. App. 3d 165, 394 N.E.2d 1068), the courts rejected requests that particular tracts of land be divided between competing electricity suppliers. Instead, the courts held that the right to serve the disputed tracts resided in one supplier exclusively. In *Coles-Moultrie*, this court stated, "Our reading of the [Electric Supplier] Act reveals that one of its express purposes was to avoid duplication of facilities." (76 Ill. App. 3d 165, 166, 394 N.E.2d 1068, 1069.) However, neither of these cases involved parcels of land which were within municipalities. While the legislature has mandated that electricity suppliers retain the right to serve specific premises which they are serving at the time an area is annexed to a municipality and that the Commission has some authority to regulate the service areas of suppliers outside municipalities, the regulation of service areas of

electricity suppliers within municipal boundaries has, with the exceptions stated in section 14 of the ESA, been left to the municipalities through use of the franchise power.

■ There is nothing in the statutes or applicable judicial decisions which prevents a municipal government from rejecting the policy of minimizing duplicative electrical service facilities by granting franchises which enable more than one electricity supplier to compete for customers within the same area. Moreover, such a policy decision, viewed in perspective, is not nearly as extraordinary as CM's arguments before this court would lead one to believe. It is indeed true that in recent years the distribution of electricity has increasingly assumed the nature of a regulated monopoly, with only one supplier per geographic area. This has not, however, been a universal phenomenon. (See C. F. Phillips, Jr., The Economics of Regulation: Theory and Practice in the Transportation and Public Utility Industries 551 (1969); see generally *Kentucky Utilities Co. v. Farmers Rural Electric Cooperative Corp.* (Ky. 1962), 362 S.W.2d 498; *Yellowstone Valley Electric Cooperative, Inc. v. Montana Power Co.* (1968), 150 Mont. 519, 437 P.2d 5; *Central Power & Light Co. v. Public Utility Com.* (Tex. 1983), 649 S.W.2d 287.) Permitting two electricity suppliers to compete for customers in the same area may, in fact, be desirable where one of the competitors is a public utility, subject to utility commission regulation as to rates, etc., and the other competitor is an electric cooperative, whose rates are not subject to regulation, but in which the member-customers have a direct voice in management. In such a situation, some customers may, for reasons of their own, prefer to be served by a regulated public utility, while others may prefer an unregulated but customer-controlled cooperative. (See *Clearwater Power Co. v. Washington Water Power Co.* (1956), 78 Idaho 150, 299 P.2d 484; *In re Otter Tail Power Co.* (N.D. Pub. Serv. Com. 1965), 58 Pub. Util. Rep. 3d (PUR) 267.) In sum, we conclude that there is no legal authority which explicitly precludes a municipality from granting franchises to two electricity suppliers to serve the same area, and that the city of Arcola's issuing franchises which permit both CM and CIPS to serve Industrial Estates was not a manifest abuse of the city's franchise power.

■ Finally, CM asserts that by virtue of its service upon CIPS of an intent to serve notice with respect to the Sukup premises, pursuant to section 7 of the ESA (Ill. Rev. Stat. 1983, ch. 111⅔, par. 407), it should have been permitted to serve Sukup during the pendency of these proceedings. However, as CIPS correctly points out, CM does not specifically assert that it is entitled to money damages on the ba-

sis of deprivation of its alleged right to serve Sukup during that period. Therefore, CM's request that we address this issue amounts to a request for declaratory relief, which may not properly be awarded in an administrative review action. Ill. Rev. Stat. 1983, ch. 110, par. 3—111.

Finding no merit in any of CM's contentions, we affirm the decisions of the circuit court and the Illinois Commerce Commission.

Affirmed.

GREEN, P.J., and MILLS, J., concur.