CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees.

Fourth District   No. 4—90—0656

Opinion filed May 2, 1991.

William S. Hanley and Liesl G. Smith, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant.

Roland Burris, Attorney General, of Springfield (David L. Nixon, Special Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

William A. Sunderman, of Brainard, Bower & Kramer, of Charleston, for appellee Coles-Moultrie Electric Cooperative.

Randall Rings, of Association of Illinois Electric Cooperatives, of Springfield, for *amicus curiae*.

JUSTICE GREEN delivered the opinion of the court:

The Electric Supplier Act (ESA) (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 401 *et seq*.), effective July 2, 1965, was adopted by the General Assembly for the stated purposes of avoiding "duplication of facilities and to minimize disputes between electric suppliers" (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 402). Section 3.5 of ESA (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 403.5) defines the term "electric supplier" to include not only a public utility which supplies electricity and is subject to regulation by the Illinois Commerce Commission (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 4—101) but also an "electric cooperative" which is a not-for-profit entity for producing, transmitting, or selling electricity and is financed directly or indirectly under the Rural Electrification Act of 1936. 7 U.S.C. §901 *et seq*. (1982).

On September 4, 1984, defendant Coles-Moultrie Electric Cooperative (CM) filed a complaint with defendant Illinois Commerce Commission (Commission) against plaintiff Central Illinois Public Service Company (CIPS) pursuant to section 7 of ESA (Ill. Rev. Stat. 1985,

ch. 111⅔, par. 407) seeking (1) a determination CM was exclusively entitled to provide electric service to a tract called "Mattoon Springs"; and (2) an order requiring CIPS to cease serving that tract. After a hearing, the Commission entered an order on April 1, 1987, granting CM that relief. However, on administrative review, the circuit court of Sangamon County reversed and remanded to the Commission with directions to consider certain issues. On remand, the Commission entered a second order on September 14, 1988, granting the same relief as before. On subsequent administrative review, the circuit court affirmed on August 28, 1990. CIPS has appealed to this court, contending (1) ESA has not preempted an existing power of municipalities to franchise the furnishing of electric services within their boundaries; and (2) the nonexclusive franchise the City of Mattoon (City) had granted CM prevented it from having any exclusive right to serve areas within the City's boundaries. We affirm.

The provisions of ESA which are most significant here are the first paragraph of section 5 and section 14. The portion of the first paragraph of section 5 which is pertinent here states:

"Each electric supplier is *entitled*, except as otherwise provided in this Act or (in the case of public utilities) the Public Utilities Act, to (a) *furnish service to customers at locations which it is serving on the effective date of this Act* \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 405.)

We will discuss later the pertinent provisions of section 14 of ESA. Ill. Rev. Stat. 1985, ch. 111⅔, par. 414.

The situation here is very similar to that before this court in *Western Illinois Electrical Coop. v. Illinois Commerce Comm'n* (1979), 67 Ill. App. 3d 603, 385 N.E.2d 149. Here, as there, we face a dispute between one electrical cooperative (here, defendant CM) and a public utility (here, plaintiff CIPS) over rights to furnish electric service to a tract of land. In each case, on July 2, 1965, the effective date of ESA, the electrical cooperative was furnishing some service to a rural tract of which the tract in issue was a part, and no other such entity was serving that larger tract. In each case, the tract in issue was subsequently severed from the larger tract and then annexed to a city with which a public utility had a franchise to furnish electrical service. In each case, the electrical cooperative had not had any fixtures on the severed tract nor had it furnished electricity used on that tract. The cases differ in that in *Western*, only the public utility had a city franchise while here both the public utility and CM had some franchise rights in regard to serving the annexing city.

Here, the original rural tract consisted of a 100-acre grain farm south of Mattoon and CM had provided electrical service to the residence and outbuildings since July 26, 1940. That service continued until 1967, when those structures were destroyed. Soon thereafter, during 1969, the 100-acre tract was divided into several smaller tracts which were sold to various persons. Beginning in 1969, CM furnished electricity to some lots. By 1985, CM had made more than 200 connections for customers on these lots. On one such tract, CM began furnishing service on December 12, 1969. The major portion of that tract, containing 6½ acres, was sold to a bedspring manufacturing firm and became known as "Mattoon Springs." On June 29, 1984, the date of the sale of that tract, the purchasers applied to CIPS for electrical service for Mattoon Springs, and on July 17, 1984, the tract was annexed to the City. In September 1984, CIPS began servicing Mattoon Springs with a line 3,450 feet in length from an existing line within the City.

The Commission deemed the situation here as analogous to that in *Western* and concluded the precedent of that decision controlled. There, a landowner had become a member of an electrical cooperative in 1946 and agreed to obtain all electrical service to his 120-acre farm from that cooperative. That service was being provided when ESA took effect. The landowner built a residence on the land in 1971 and the cooperative then served that residence. A lot was severed from the farm tract and sold, and a public utility then served the lot. Later, in 1972, a portion of the farm and the previously served lot were annexed to the City of Hamilton, from which the public utility had a franchise. In a proceeding before the Commission, that body ruled the cooperative had a right to continue to serve the farm building, but could not extend its lines on the annexed lands for any other purpose without permission from the City of Hamilton.

On administrative review in *Western*, the circuit court reversed the Commission and remanded to the Commission for further consideration. On review to this court, a split panel affirmed. This court noted that the purpose of ESA was to eliminate disputes between electrical suppliers. In addition, this court indicated the first paragraph of section 5 of ESA, speaking of a supplier retaining the right to serve "locations" which it was serving on the effective date of ESA, was not to be construed narrowly. Much of the dispute in that case concerned the relationship between portions of the first paragraph of ESA, which we have previously set forth, and provisions of section 14 of ESA. Section 14 states in pertinent part:

"Except as otherwise provided in this Section, Sections 5 (*other than the first paragraph thereof*), 7 and 8 of this Act do not apply to any area which is located within an incorporated municipality on the effective date of this Act and *shall cease to apply to any area after it is annexed to or otherwise becomes located within an incorporated municipality*. An electric supplier which is serving in an area which has been or hereafter becomes annexed to or otherwise located within an incorporated municipality may continue to furnish service within such *** area to the premises which it is serving at the time of such annexation or incorporation provided that *** (iii) *no such* [supplier] *serving in an area* *** so annexed to *** an incorporated municipality after the effective date of this Act *may* furnish service to any additional premises or *extend its lines into or within such area unless such supplier is or shall become authorized so to do by the incorporated municipality*." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 111⅔, par. 414.

One of the problems involved in interpreting the legislative intent evidenced by the first paragraph of section 5 and section 14 of ESA arises because the first paragraph of section 5 is prefaced by the phrase, "except as otherwise provided in this Act"; while section 14 begins by stating that various provisions of ESA, but not the first paragraph of section 5, do not apply to areas which became annexed to municipalities. A specially concurring opinion in *Western* reasoned that the above language indicated that the first paragraph of section 5 of ESA was to apply even if the land had been annexed to a municipality. (*Western*, 67 Ill. App. 3d at 607, 385 N.E.2d at 152 (Green, J., specially concurring).) That special concurrence then suggested that because the essence of section 14 is to determine rights to service land which has been annexed to a municipality, the General Assembly did not likely intend the provisions of section 14 which expressly exclude the first paragraph of section 5 from the provisions which are not applicable after annexation to a municipality to be the exception "otherwise provided" for in the first paragraph of section 5. *Western*, 67 Ill. App. 3d at 607, 385 N.E.2d at 153.

Justice Trapp dissented strongly in *Western*. (*Western*, 67 Ill. App. 3d at 608, 385 N.E.2d at 153 (Trapp, J., dissenting).) He reasoned that if the provisions of section 14 of ESA, arising when land is annexed to a municipality, were not the language in ESA which operated as an exception to the first paragraph of section 5, then the language "except as otherwise provided" in section 5 would be meaningless, because he could find no other portion of ESA to which

that language would likely be applicable. Justice Trapp reasoned that a logical reconciliation between the first paragraph of section 5 and section 14 would, when land is annexed to a municipality, allow an electrical supplier which was supplying electricity at a particular point for a particular purpose on the effective date of ESA to continue to do so, but let the municipality determine the supplier for any additional severed tracts or points. Justice Trapp indicated this interpretation conformed to the previously quoted language of part (iii) of section 14, which stated:

> " '[N]o such electric supplier which is serving in an area which becomes so annexed to or otherwise located within an incorporated municipality after the effective date of [ESA] may furnish service to any *additional premises* or extend its lines into or within such area unless such supplier is or shall become authorized so to do by the incorporated municipality.' " (Emphasis in original.) *Western*, 67 Ill. App. 3d at 609, 385 N.E.2d at 154, quoting Ill. Rev. Stat. 1977, ch. 111⅔, par. 414.

On appeal, CM and the Commission rely upon the precedent of *Western* and request we adhere to it. CIPS maintains *Western* is wrong and that we should overrule it. Part of CIPS' contention is that set forth in the dissent of Justice Trapp in *Western*. However, beyond that reasoning, CIPS maintains that the first paragraph of section 5 of ESA should not be interpreted to limit the effect of the franchise given CIPS to furnish service to premises within Mattoon because (1) the power of municipalities to license or franchise utilities arises from the power of those units to control and regulate their streets and (2) a subsequent opinion of this court indicates ESA was not intended to impair that power.

The subsequent opinion of this court to which CIPS refers is *Coles-Moultrie Electric Cooperative v. Illinois Commerce Comm'n* (1985), 131 Ill. App. 3d 946, 476 N.E.2d 1303 (*Arcola*). There, this court upheld a Commission decision that CM and CIPS had equal right to provide electrical service to tracts in an industrial park which had been annexed to the City of Arcola. Unlike the instant case, neither supplier had been furnishing service to that land until after the effective date of ESA. Thus, the first paragraph of section 5 of the Act was not involved. In 1945, CIPS had been awarded a 75-year franchise to furnish electrical service within Arcola's existing and extended boundaries. On June 3, 1969, CM was granted a franchise to furnish electrical service to a limited area which included that in question.

In *Arcola*, CIPS furnished the first electrical service to a tract in the park when it extended a line to a concrete mixing plant used to service the construction of nearby Interstate 57. Then, on March 3, 1969, CM began serving another tract in the park for use in constructing a building for G&S Services. On March 17, 1969, the industrial park was annexed to Arcola. Prior to that, CIPS had stopped serving the mixing plant. A dispute then arose as to which supplier could service the G&S building upon completion of construction, and the Commission awarded that service to CM. Between April 1970 and March 1983, CIPS connected to eight commercial customers and CM connected to an additional customer and some mobile homes in the area. A dispute then arose over which supplier was entitled to give service to a building which was being constructed and to which CM had extended a line from the G&S building. *Arcola*, 131 Ill. App. 3d at 948-49, 476 N.E.2d at 1304.

Justice Trapp wrote a comprehensive opinion for a unanimous panel. The opinion discussed the case of *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26, which established the theory that the power of a municipality to franchise a supplier of utility services arises from its power to regulate and control its streets. CIPS' brief discusses this theory in great detail and traces the history through the decision of this court in *Illinois Broadcasting Co. v. City of Decatur* (1968), 96 Ill. App. 2d 454, 238 N.E.2d 261, where the power of the city to control and regulate its streets was held to authorize the city to franchise a cable television company which produced that service for the residents of the city by stringing its wires along those streets.

In *Arcola*, contention was made that CIPS did not have an unchecked right to bring its lines into areas within the limits of the city. *Arcola* quoted section 2.1 of ESA, which stated:

"'It is declared to be the public policy of this State, pursuant to paragraphs (h) and (i) of Section 6 of Article VII of the 1970 Illinois Constitution, that, except as otherwise provided in this Act, any power or function set forth in this Act to be exercised by the State is an exclusive power or function and such power or function may not be exercised concurrently, either directly or indirectly, by any unit of local government.'" (*Arcola*, 131 Ill. App. 3d at 955, 476 N.E.2d at 1308, quoting Ill. Rev. Stat. 1983, ch. 111²/₃, par. 402.1.)

This court then stated:

"In our opinion, this provision makes it clear that those matters committed to the Commission's discretion by the ESA are

matters for the Commission and not municipalities to determine. However, the second paragraph of section 14 of the ESA clearly removes the extension of electric lines pursuant to franchises in existence on the ESA's effective date from the control of the Commission and vests sole authority as to such extensions in municipalities." (*Arcola*, 131 Ill. App. 3d at 955, 476 N.E.2d at 1308.)

The second paragraph of section 14 of ESA states:

"Nothing in this Section requires any electric supplier to obtain any authorization, either from an incorporated municipality or from the Commission, to extend its lines if, and to the extent that, such supplier, on the effective date of this Act, has such authorization from such municipality or from the Commission under the Public Utilities Act, as the case may be, or as a matter of law, but any such authorization must be lawfully in effect at that time." Ill. Rev. Stat. 1985, ch. 111⅔, par. 414.

CIPS maintains that by the foregoing language this court recognized that the power of a city to franchise is so strong that the first paragraph of section 5 of ESA gives no right to continue service in the face of an annexation to a municipality which had granted a franchise to another electrical supplier, particularly where, as here, the franchise had been granted prior to the effective date of ESA. We do not agree.

The quoted language from *Arcola* concerns the need of a supplier to get power from the Commission before extending a line. The language referred to the situation in *Arcola* where no party had rights under section 5 of ESA to service the area involved. A few paragraphs earlier, the opinion had explained that section 14 of ESA excepted suppliers fitting the language of the first paragraph of section 5 of ESA from its coverage. (*Arcola*, 131 Ill. App. 3d at 953, 476 N.E.2d at 1307.) That opinion was written by Justice Trapp, who had dissented in *Western* but was recognizing the precedent of *Western* in acknowledging the interpretation the *Western* majority had given to sections 5 and 14.

■ Moreover, in arguing that the quoted language from *Arcola* indicates a municipality has plenary power in regard to extension of lines into newly annexed areas by suppliers having municipal franchises predating ESA, CIPS goes beyond the theory of Justice Trapp's dissent in *Western*. There, Justice Trapp agreed that section 5 gave a supplier serving an exact point on the effective date of ESA a right to continue that service, without extending lines, which is superior to a franchise of a municipality to which the area is annexed.

(*Western,* 67 Ill. App. 3d at 609, 385 N.E.2d at 154.) He objected to extending the right to annexed areas of the property being served on the effective date of ESA which had been severed or would require a substantial extension of lines. (*Western,* 67 Ill. App. 3d at 609-10, 385 N.E.2d at 154.) We also note that the second paragraph of section 14 of ESA begins with the words "[n]othing in this Section requires any electric supplier to obtain any authorization." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 414.) The language does not negate requirements or limitations created by section 5 of ESA.

We do not agree with CIPS that any aspect of the historical power of municipalities to control and regulate their streets, or any language in the opinion of this court in *Arcola,* indicates or requires an abandonment of our holding in *Western.*

■ This case differs from *Western* in that here CM has a limited franchise with the municipality. The CM franchise in force at times pertinent was limited by the following provisions of that document:

> "The rights granted herein shall extend to and include all the locations, premises, areas and territory annexed to the Municipality prior to, on, or after the effective date of this Ordinance, for which one or more of the following conditions apply: (a) Grantee has electric lines in, or in proximity to; (b) Grantee would be entitled to serve with electricity by virtue of the provisions of the Electric Supplier Act, as enacted by the Seventy-Fourth General Assembly of the State of Illinois and approved on July 2, 1965, if said locations, premises, areas or territory had not been annexed; (c) Grantee is entitled to serve with electricity by virtue of the provisions of the Electric Supplier Act, as enacted by the Seventy-Fourth General Assembly of the State of Illinois and approved on July 2, 1965."

We agree with CIPS that the franchise involved is not exclusive. It does not give CM any greater rights than those obtained from section 5 of ESA as set forth in *Western.* On the other hand, we disagree with CIPS' contention that the fact the franchise was not exclusive prevented CM from having whatever exclusive rights were granted by section 5. Nothing in the franchise instrument indicates CM was giving up any rights.

■ We recognize the close question of interpretation involved in *Western* and that reasonable minds can differ as to whether it was properly decided. However, that decision was made over 12 years ago. The General Assembly has not seen fit to change the law, and neither the Illinois Supreme Court nor any district of the appellate court has overruled or rejected that decision. No doubt many actions have been

taken in reliance upon it. Accordingly, under the doctrine of *stare decisis*, we conclude we should stand by that precedent in this case. Accordingly, we affirm the decision of the circuit court of Sangamon County.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.